Janine BLOOM, Petitioner

v.

The **PEOPLE** of the State of Colorado, Respondent.

No. 06SC597.

Supreme Court of Colorado, En Banc.

June 9, 2008.

---

Douglas K. Wilson, Colorado State Public Defender, Anne Stockham, Deputy State Public Defender, Denver, Colorado, Attorneys for Petitioner.

John W. Suthers, Attorney General, Christine C. Brady, Assistant Attorney General, Appellate Division, Criminal Justice Section, Denver, Colorado, Attorneys for Respondent.

Justice EID delivered the Opinion of the Court.

Petitioner Janine Bloom appeals her conviction for knowingly causing the death of a child under twelve years of age by one in a position of trust.[1] Bloom argues that the trial court made two errors. First, she points to the fact that the trial court refused to declare a mistrial after one witness told the jury that another witness had failed a polygraph. Second, she points to the trial court's determination that she was competent to proceed even though no formal competency examination had been performed. Bloom contends that these two actions by the trial court violated her constitutional rights and constituted an abuse of discretion requiring reversal. The court of appeals affirmed Bloom's conviction. *See People v. Bloom*, No. 03CA1982, 2006 WL 2062459 (Colo.App. May 25, 2006) (not selected for official publication).

We now affirm the court of appeals. We hold that the reference to the witness's polygraph results did not violate Bloom's right to confront the witnesses against her or her right to trial by an impartial jury. We also hold that the trial court did not abuse its discretion by denying Bloom's motion for a mistrial based on the reference. With respect to the competency proceedings, we hold that the trial court did not abuse its discretion by finding Bloom competent to proceed. We further hold that the trial court's failure to obtain a formal competency examination did not render Bloom's competency hearing inadequate under the circumstances because other evidence established Bloom's competency.

## I.

### A.

Bloom's six-month-old son, Christopher, died in Bloom's Colorado Springs apartment on the morning of June 30, 2002. Bloom and a man named Jeremy Ellis were present in the apartment at the time. They called 911 at 9:19 a.m., and police and fire department personnel arrived around 9:30 a.m. The emergency responders found Christopher cold and stiff and lying about six feet away from a makeshift bed—composed of a comforter and a folded blanket—that was located in the center of the master bedroom. A black plastic bag was next to Christopher, and his diaper bag was located on a pile of clothes a few feet away.

Around the time of Christopher's death, Bloom had relationships with three men: Jeffrey McAllister, Ellis, and Josh Gouge. McAllister was Bloom's husband. Ellis was McAllister's friend, and the two served in the Army together. Gouge was Bloom's boyfriend before she met McAllister, and the two had a child together after Christopher's death. Bloom once threatened Gouge with loss of custody of his child if he did not stand by her during the investigation of Christopher's death.

Throughout the course of that investigation, Bloom provided inconsistent stories to the police. She told fire department personnel that she and Ellis awoke around 8:30 a.m. and that she checked Christopher and saw

---

1. "A person commits the crime of murder in the first degree if ... [t]he person knowingly causes the death of a child who has not yet attained twelve years of age and the person committing the offense is one in a position of trust with respect to the victim." § 18–3–102(1)(f), C.R.S. (2005).

that he was okay. She then said that she checked Christopher again after smoking a cigarette and found him off his bed with the plastic bag covering his head and part of his body. However, when Bloom spoke with Detective Karl Herndon at the scene, she said that she checked on Christopher only once that morning, which was after she finished smoking.

Bloom also gave two videotaped interviews to the police, on June 30 and July 22, 2002. Ellis was interviewed on June 30th as well. Toward the end of the first interview, Bloom blurted out, "Our stories aren't corroborating, are they?" She then asked, "Has Jeremy [Ellis] been convicted of anything?" During the second interview, a detective confronted Bloom with the fact that babies do not suffocate in bags unless some force is applied. Bloom responded by changing her story and claiming that the plastic bag was farther up Christopher's body so that it just covered his head and his arms were holding the bag against his face.

Bloom also made some incriminating statements. She told Gouge that she "killed Christopher" because she "didn't see that black bag." She attempted suicide on the evening after she made this remark, and her suicide note, which was addressed to McAllister, Ellis, and Gouge, stated in part, "Please, some day maybe y'all can forgive me for killing our little boy." Bloom told McAllister, "I felt like I killed [Christopher]," and "I think I killed him." When McAllister later called Bloom to discuss the possibility of a divorce, Bloom responded, "I know I killed my baby. I know it was wrong. I'm not crazy, and no, I'm not giving you a divorce." Finally, Bloom speculated in her diary that she might go to jail for Christopher's death; in particular, she wrote in reference to her subsequent pregnancy, "I promise I'll take better care of this baby. I'll even go to classes. God, please don't let man hate or take our baby away from me, and please don't let man convict me for Christopher's death."

Ellis also gave two videotaped interviews to the police on June 30 and July 17, 2002.

Ellis asserted that Bloom was innocent. He also stated that he never saw a plastic bag near Christopher, but when the interviewing detective told him that bags are easily printable, Ellis admitted that he might have moved the bag. (In fact, Ellis's fingerprint was found on the bag.) At one point, Ellis denied responsibility for Christopher's death and exclaimed, "I can't believe [Bloom's] trying to pin it on me.... No, no [she] is pinning this on me." During the second interview, Ellis made multiple changes to his story, including (1) revealing that he had a sexual relationship with Bloom and that he and Bloom had sex on the morning of Christopher's death; (2) stating that Christopher was cold, not warm, when first found; and (3) admitting that he moved the plastic bag before emergency personnel arrived. At the request of the police, Ellis took a polygraph test on the morning after the second interview, and he failed it.

Ellis later changed his story and accused Bloom of murdering Christopher. In September 2002, he told McAllister that on the morning of June 30th, Bloom showed him how she had used her hand to suffocate Christopher and then asked Ellis to help her coordinate their stories for the police. Then, on February 11 and 12, 2003, Ellis gave a written statement, signed under penalty of perjury, to the Army's Central Investigation Detachment.[2] Ellis wrote that Bloom suffocated Christopher with her hand, that she asked him to help cover up the crime, and that he obliged by giving a false statement to the police. Ellis's written statement was contrary to his first two videotaped interviews, but it was consistent with the fact that he had failed the polygraph that he took the morning after his second interview.

Ellis's written statement prompted new developments in the case. Although the coroner had originally concluded that Christopher's death was due to either SIDS or asphyxiation, he ruled out SIDS based on Ellis's written statement. Also based on that statement, Bloom was charged with knowing-

---

**2.** The Army was attempting to close the investigation of Ellis so that he could be deployed to Iraq.

ly causing the death of a child under twelve years of age by one in a position of trust.

## B.

Bloom first appeared in court with counsel on March 4, 2003, for a pre-trial hearing. On May 12, 2003, defense counsel requested the court to order that Bloom be provided with Lexipro, an antidepressant, because she had a history of postpartum depression. In fact, Bloom's hospital had prescribed Lexipro, but the jail provided Prozac, also an antidepressant, instead. Bloom refused Prozac, purportedly because of its side effects. The jail never provided Lexipro, and Bloom never took Prozac.

At a suppression hearing on July 28, 2003, defense counsel stated for the first time that she did not believe that Bloom could make it through trial without Lexipro. On July 31, 2003, counsel filed a motion for a competency examination. Counsel argued that Bloom was not receiving treatment or medication for her depression and that Bloom consequently would "not [be] able to assist in her defense in a way that is meaningful." Counsel noted Bloom's history of Attention Deficit Hyperactivity Disorder, Posttraumatic Stress Disorder, and postpartum depression, and she further stated that Bloom had been "extremely emotional throughout the trial proceedings," and that "[Bloom] completely had broken down" after a recent motions hearing. Counsel represented that it was "extremely difficult to discuss the plea agreement that has been offered, as well as the facts of the case and the preparation of the case" because "[Bloom] is not able to process all of that information due to her emotional and mental health state."

The trial court, Judge Kennedy presiding, denied Bloom's motion, stating, "It is your burden to establish by a preponderance of the evidence that she is incompetent, and you have not done sufficient assertion even to order a competency evaluation to the Court." The judge relied on his in-court observations of Bloom and his conversations with personnel at the jail where Bloom was being held. The judge then proceeded to set a date for a preliminary competency hearing.

The preliminary competency hearing was held on August 8, 2003. Defense counsel presented testimony from a nurse at the jail.

The nurse stated that Bloom was receiving group therapy for depression, that she had complained about problems with other inmates in her ward, and that she had expressed fear for her safety and requested a transfer to another ward. The nurse attributed these problems to Bloom's "mood swings," and she noted that Bloom had not attempted suicide while in jail and that the jail's mental health personnel had not considered Bloom's behavior serious enough to send her to the state hospital for a mental health examination. Finally, the nurse testified that she was unaware of any concerns regarding Bloom's legal competency, although she admitted that she was not qualified to opine on this subject.

Judge Kennedy entered a preliminary determination that Bloom was competent to proceed. He reiterated his previous findings, noting that although Bloom was "near hysterical" during her first court appearance, she was able to control herself during subsequent proceedings and appeared to communicate effectively with her attorneys. The judge concluded that "there has been no evidence presented to the Court that she is not able to understand the proceedings as to this point." On this basis, Judge Kennedy entered a preliminary determination that Bloom was competent, and he scheduled a hearing for a final competency determination by a different judge, Judge Kane. In the meantime, Judge Kennedy ordered the jail psychiatrist, Dr. Michelle Moran, to evaluate Bloom with respect to the "legal competency determination that Judge Kane will be required to make." Judge Kennedy also stated that Judge Kane could order a "full-blown competency evaluation if at that time he felt that it was necessary for him to make a determination."

At the final competency hearing on August 15, 2003, Moran was the only witness. She testified that she had evaluated Bloom on August 8th at the direction of the jail and had reviewed Bloom's chart the following day. The purpose of this evaluation was to determine "whether [Bloom] was experiencing depression or anxiety ... whether or not she was thinking clearly, whether she was able to remember things well, whether she

was having psychotic symptoms or hallucinations, and those kinds of things." Based on this evaluation and a review of Bloom's chart, Moran concluded that Bloom suffered from "an adjustment disorder depressed" that was "not medication responsive." Moran elaborated that she "didn't feel that [Bloom] was in need of antidepressants" and that Bloom "very clearly [did] not want medication intervention." Moran also testified that she had no concerns about Bloom's competency. In Moran's opinion, Bloom was able to communicate "very effectively" and understand the charges against her and her defense. Bloom was not "confused or having memory lapses or delusional beliefs," nor was she "impaired by her moods" or otherwise unable to "do her best in terms of cooperating with her defense."

Moran stated, however, that she had not performed a formal competency examination, but had only conducted a medical evaluation. Thus, Judge Kane ordered her to conduct a formal competency examination by 3:00 p.m. the following Monday. The judge further ordered that Bloom was not entitled to have an independent exam performed by the state hospital.

Judge Kane reconvened the final competency hearing on August 18, 2003. However, Moran had declined to perform a competency examination, citing an ethical conflict arising from her status as Bloom's treating physician. Defense counsel took the position that the court did not have sufficient information to determine the competency issue and that consequently, a competency examination was necessary. The prosecutor responded that Bloom had not made a threshold showing of incompetency and that all the evidence presented at the competency hearings showed that Bloom was in fact competent to proceed.

Judge Kane ruled that Bloom had failed to meet her burden of proof that she was not competent to proceed. Specifically, the judge stated, "[Dr. Moran's] medical evaluation included sufficient evidence with regard to Mrs. Bloom's competency to proceed." The judge then summarized the doctor's testimony:

> Dr. Moran testified that Mrs. Bloom has trouble focusing, but she testified it was not so as to make her incompetent to proceed. She testified there [were] some swings in mood, differential moods. That is understandable under the circumstances. She testified there was not the presence of post traumatic stress disorder, no biological mental history and no blackouts. She testified to the existence of fibromyalgia and ADHD, asthma, and abnormal electrocardiogram findings but none of these existing conditions were indicators of incompetence to proceed. She did not find significant memory deficits. Dr. Moran testified that in her view, Mrs. Bloom had portrayed herself as capable of working with her counsel. That she did recite she did not do it. She wanted to fight her case, that she felt traumatized by finding the baby. She was concerned about the social stigma and understood charges that were brought that led to the concern about the social stigma. Overall the testimony of Dr. Moran of her mental status was good. She was able to engage in rational proceedings and thought her processes were appropriate and linear.

Thus, Judge Kane declined to order an additional competency examination, and instead, ordered that the case go to trial.

### C.

Trial commenced on August 19, 2003, and the jury heard evidence supporting the foregoing facts surrounding Christopher's death. The prosecution's theory of the case was that Bloom was a manipulative person who used sex to control the men in her life and who murdered Christopher because he hampered her lifestyle. The defense contended that Bloom did not harm Christopher, that the cause of death was unknown, and that Ellis had fabricated Bloom's admission in an effort to deflect investigation of his own involvement in Christopher's death.

The prosecution called Ellis to testify. Ellis began by telling the jury that he had been convicted as an accessory to the murder of Christopher. The defense requested, and the trial court gave, a limiting instruction to the jurors, stating that Ellis's conviction could only be considered for the purpose of assessing Ellis's credibility. Ellis then reaffirmed the story he told the police during his first two interviews (June 30 and July 17,

2002). He also testified that he lied when he gave his third statement (February 11 and 12, 2003) implicating Bloom.

The prosecutor impeached Ellis with the many inconsistencies in his statements. Those inconsistencies included whether he moved the plastic bag, whether Christopher was warm or cold when found, whether he had sex with Bloom on the morning of Christopher's death, and whether he checked on Christopher that morning.

The major point of impeachment concerned Ellis's statements to McAllister and to Army investigators that Bloom had admitted killing Christopher. In response to the prosecutor's questions, Ellis denied having a conversation with McAllister about the events of June 30th. McAllister, however, confirmed this conversation during his testimony. The prosecutor also confronted Ellis with his February 11 and 12, 2003 statement to the Army investigators. Ellis denied most of the statement, which was then admitted into evidence.

Ellis did agree that it was impossible for Christopher to move from his bed toward the diaper bag under his own power because he could not crawl and could barely roll over. Also, the jury viewed the videotapes of Ellis's interviews with the police, and one of the tapes contained a reference to the fact that Ellis was going to take a polygraph.

Gouge testified next for the prosecution. He talked about his relationship with Bloom, and he then began discussing some inconsistencies in Bloom's story:

Gouge: If I recall, I think I told [Detective Jaworski] that there were changes in the story.

Prosecutor: What were those changes?

Gouge: Just little things. You know, she smoked no cigarettes, she smoked one, she smoked two. She ate, she didn't eat, just a little changing of the story, you know.

Prosecutor: And was one of the things how they found Christopher?

Gouge: I can't recall if that was one of the things that changed.

Prosecutor: Was she also saying things to you derogatory about Mr. Ellis?

Gouge: Yeah.

Prosecutor: What was she saying?

Gouge: That Ellis failed his polygraph the first time.

Defense counsel immediately objected to the statement about the polygraph results, and the trial court issued the following curative instruction: "Members of the jury, you are instructed to disregard that statement. It is hearsay and entirely inadmissible, and there is no foundation for that whatsoever, so you're to disregard that statement in entirety." The prosecutor then focused the discussion on a statement that Bloom made to Gouge in which she accused Ellis of drugging her on the night of Christopher's death.

The following morning, defense counsel requested a mistrial because of Gouge's reference to Ellis's polygraph results. The trial court found that, while it "would [have] prefer[red]" that the reference had not occurred, a mistrial was not necessary. First, the trial court pointed out that the jury already knew that Ellis had taken a polygraph because it was referenced in one of Ellis's interviews, a videotape of which was shown to the jury earlier in the trial. Next, the court pointed out that, immediately after Gouge made the statement referencing Ellis's polygraph results, it "instructed the jury they could not consider it, that there was no foundation, and the statement could not be considered by them for any reason." The court also stated that it would give another written instruction before the jury started deliberations "reiterating that they may not consider any evidence which has been stricken by the Court." In addition, the court found it significant that the reference involved a polygraph taken by a witness, rather than by the defendant herself. Finally, it noted that "the jury is in a position to judge Mr. Ellis's credibility for themselves." Based on these observations, the trial court concluded that it "did not think that [the reference] rises to the level of manifest necessity to require a mistrial."

Trial continued with the prosecution presenting additional evidence. The jury watched the videotapes of Bloom's June 30 and July 22, 2002 interviews with the police. Also, the coroner testified that a plastic bag would have to be sucked into a baby's nose and mouth to cause suffocation. He further stated that the plastic bag found near Chris-

topher was not adherent to Christopher's nose or mouth, meaning that air could pass freely to Christopher. He opined that some force would need to be applied to cause a six-month-old baby to suffocate and that it only takes twenty to thirty seconds of suffocation to stop a baby's breathing, after which the baby will suffocate unless his breathing is restarted. Finally, the laboratory agent who tested the plastic bag testified that no traces of saliva were found on the bag and that such traces would be expected if the bag had been close enough to Christopher's nose and mouth to cause suffocation.

The defense rested without presenting any evidence, and the case was submitted to the jury on August 22, 2003. Six days later, the jury returned a verdict finding Bloom guilty of knowingly causing the death of a child under twelve years of age by one in a position of trust. The trial court proceeded to sentence Bloom to life imprisonment without parole. At one point during the pronouncement of sentence, Bloom interjected, "Why would I go and pick up my child if I wanted to hurt him?" The trial court responded:

> I don't know.... But 12 jurors listened to the evidence. They spent three days pouring over every detail of that evidence. I've not seen a jury work as this jury did. It's clear they agonized over the decision, but they found that the prosecution had proven beyond a reasonable doubt that you were responsible for the death of this child.

The court of appeals affirmed Bloom's conviction. As pertinent here, the court held that Gouge's reference to Ellis's polygraph results did not warrant a mistrial because (1) the reference was inadvertent, (2) the trial court gave a curative instruction, (3) the jury had already heard that Ellis had taken a polygraph, (4) the reference concerned a witness, rather than the defendant, and (5) the jury had sufficient other evidence for assessing that witness's credibility. *Bloom*, No. 03CA1982, slip op. at 26–27. The court also upheld the trial court's determination that Bloom was competent to stand trial and that no formal competency examination was necessary. *Id.* at 16, 21.

**II.**

Bloom first argues that the trial court's refusal to declare a mistrial due to Gouge's reference to Ellis's polygraph results violated her constitutional rights—specifically, her right to confront the witnesses against her and her right to a trial by an impartial jury.[3] Under these circumstances, our "first step ... is to determine if an error occurred." *Medina v. People*, 114 P.3d 845, 857 (Colo. 2005). Thus, we consider each of Bloom's arguments in turn.

**A.**

■ The Confrontation Clause prohibits the admission of out-of-court statements as evidence against the accused. *Crawford v. Washington*, 541 U.S. 36, 50–51, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004); *see also People v. Fry*, 92 P.3d 970, 978 (Colo.2004) (applying *Crawford*). In this case, however, Gouge's reference to Ellis's polygraph results was not admitted into evidence. To the contrary, the trial court expressly instructed the jury not to use the statement for any purpose whatsoever at the time the reference was made, and the court repeated that instruction in written form to the jury before deliberations. We presume that the jury followed these instructions. *See Medina*, 114 P.3d at 856 (noting presumption that jury follows trial court's instructions); *People v. Dunlap*, 975 P.2d 723, 743 (Colo.1999) (presuming that the jury follows curative instructions); *see also Bernal v. People*, 44 P.3d 184, 201 (Colo.2002) (stating that a contemporaneous curative instruction "diminishes the possibility of reversible constitutional error"). Therefore, we hold that the trial court did not violate Bloom's right to confront the witnesses against her.

■ The other constitutional error alleged by Bloom stems from her due process rights. "The due process clauses of the Colorado and United States Constitutions guarantee every criminal defendant the right to a fair trial," which "includes the right to an impartial jury." *Dunlap v. People*, 173 P.3d

---

**3.** Bloom asserts in her brief that the trial court violated her "constitutional rights to due process of law and to a fair trial, to confront witnesses against her, and to a fair and impartial jury." However, she makes no due process or fair trial arguments apart from the argument that the jury was improperly influenced by Gouge's reference to Ellis's polygraph results.

1054, 1081 (Colo.2007). This right may be violated when "evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair." *Payne v. Tennessee,* 501 U.S. 808, 809, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). The test is whether under the totality of the circumstances, Bloom's due process rights were violated. *See McGuire v. People,* 749 P.2d 960, 963 (Colo.1988) (applying the totality of the circumstances test).

Bloom argues that the reference to Ellis's polygraph results was so critical to the jury's assessment of Ellis's credibility and Bloom's guilt that it must have improperly biased the jury. She contends that the trial court's instructions did not alleviate this bias. We disagree.

We first note that Bloom has failed to cite—and we are unable to find—any case holding that a single, inadvertent reference to a witness's polygraph results violates due process when the reference is immediately followed by a curative instruction. *Cf. Maldonado v. Wilson,* 416 F.3d 470, 477 (6th Cir.2005) (observing that neither the Supreme Court nor any federal appellate court has found a violation of the due process right to a fair trial as a result of "statements implying the results of a polygraph or similar test").

Nor do we believe that the reference to Ellis's polygraph results was so critical that it must have biased the jury verdict. The jury heard that Ellis was a convicted felon. They viewed the videotapes of Ellis's interviews with the police. They observed the inconsistencies in the statements that Ellis provided during the first two interviews when he proclaimed Bloom's innocence, and they watched him respond to the prosecutor's request that he confirm or deny each portion of his third statement in which he accused Bloom of murdering Christopher. Finally, McAllister testified that Ellis told him that Bloom had admitted murdering Christopher and had asked Ellis to help cover up the crime. Thus, contrary to Bloom's argument, the jury had sufficient evidence with which to evaluate Ellis's credibility regarding his February 11 and 12, 2003 statement implicating Bloom.

Moreover, the prejudicial impact of the reference to Ellis's polygraph results was mitigated in several ways. First, it is significant that the polygraph reference involved a test taken by a witness, not by the defendant herself. *See United States v. Brevard,* 739 F.2d 180, 183 (4th Cir.1984) (recognizing that a reference to a defendant's polygraph results is more serious than a reference to a witness's results); *accord United States v. Walton,* 908 F.2d 1289, 1293 (6th Cir.1990) (stating that a reference to a defendant's polygraph results "implicates a defendant's fifth amendment right not to incriminate himself"). In addition, the reference to the results was singular and inadvertent, and the jury was not told which portion of Ellis's statements had failed the polygraph. The trial court also gave a curative instruction at the time of the reference, and reiterated that instruction in writing before the jury deliberations. *See Thornburg v. Mullin,* 422 F.3d 1113, 1125 (10th Cir.2005) (citing similar circumstances in concluding that no due process violation occurred when the jury was told that the prosecution's star witness had passed a polygraph).

Finally, there was sufficient other evidence of Bloom's guilt. *See id.* (citing other evidence of guilt as a factor that mitigates the mention of polygraph results). Bloom gave inconsistent stories to police, which were highlighted by the testimony and videotapes at trial. She made several admissions of guilt in conversations with McAllister and Gouge, in her diary, and in her suicide note. In addition, the testimonies of the laboratory agent and the coroner cut against Bloom's claim that the plastic bag suffocated Christopher. Finally, the evidence of Bloom's relationships with McAllister, Ellis, and Gouge supported the conclusion that Bloom had manipulated Ellis into helping her cover up Christopher's murder.

In sum, we conclude that the reference to Ellis's polygraph results, when considered under the totality of the circumstances, did not render Bloom's trial fundamentally unfair. Therefore, we hold that the reference did not violate Bloom's right to trial by an impartial jury.

## B.

 Having determined that Bloom has failed to show constitutional error, we turn to her alternative argument that the trial court abused its discretion by denying her request for a mistrial. "In the absence of a constitutional violation, it is well-established that the decision to grant or deny a motion for a mistrial is directed to the sound discretion of the trial court," and the court's decision "will not be disturbed absent a clear showing of an abuse of discretion and prejudice to the defendant." *People v. Chastain*, 733 P.2d 1206, 1213 (Colo.1987) (citing *People v. Haymaker*, 716 P.2d 110 (Colo.1986); *Massey v. People*, 649 P.2d 1070 (Colo.1982); *People v. Saars*, 196 Colo. 294, 584 P.2d 622 (1978)). Because "[a] mistrial is the most drastic of remedies . . . [i]t is only warranted where the prejudice to the accused is too substantial to be remedied by other means." *People v. Collins*, 730 P.2d 293, 303 (Colo.1986) (citations omitted).

 We have previously held that polygraph evidence is per se inadmissible. *See People v. Dunlap*, 975 P.2d at 755 (affirming the rule of *People v. Anderson*, 637 P.2d 354, 361 (Colo.1981)). This per se ban is an evidentiary rule rooted in the concern that polygraph evidence will prejudice the jury's evaluation of a witness's credibility. *People v. Dunlap*, 975 P.2d at 755–56; *see also United States v. Scheffer*, 523 U.S. 303, 309–10, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998) (describing the per se ban of polygraph evidence as an evidentiary rule designed to eliminate unreliable evidence from trial). Thus, it is possible that a mistrial could be warranted if information about a witness's polygraph results caused prejudice that was "too substantial to be remedied by other means." *Collins*, 730 P.2d at 303. Because the decision to declare a mistrial must be examined on a case-by-case basis, we look to the circumstances of Bloom's case to determine whether there was a "clear showing of an abuse of discretion" by the trial court in denying her motion for a mistrial. *Chastain*, 733 P.2d at 1213.

We begin by noting that, as with the Confrontation Clause argument, it is not clear whether the rule against the admission of polygraph evidence was actually violated during Bloom's trial. In fact, the trial court refused to admit Gouge's statement about Ellis's polygraph results, and the court also issued a curative instruction at the time, and reiterated it in writing before deliberations. However, we do not need to address the issue here because even assuming that Gouge's statement created some prejudice—as a violation of our evidence rules or otherwise—we do not believe the prejudice was "too substantial to be remedied by other means" as required to warrant a mistrial.

As noted above, the trial court, in denying Bloom's motion for a mistrial, stated that while it would have preferred that Gouge's reference to Ellis's polygraph results had not occurred, a mistrial was not required. First, it pointed out that the jury already knew that Ellis had taken a polygraph, as it was mentioned in a videotape of one of Ellis's interviews shown to the jury earlier in the trial. Second, the court noted that it had immediately instructed the jury to disregard Gouge's reference to the polygraph, telling them that the statement was "hearsay and entirely inadmissible, and there is no foundation for that whatsoever, so you're to disregard that statement in entirety." The court also noted that it would reiterate this instruction in written form before jury deliberations. It went on to find it significant that the reference was to the polygraph results of a test taken by a witness, not the defendant herself. Finally, the court noted that "the jury is in a position to judge Mr. Ellis's credibility for themselves," suggesting that the jury had sufficient other evidence before it with which to consider Ellis's credibility. In addition to the considerations cited by the trial court, we note that, as discussed above, the reference was singular and inadvertent, and there was sufficient other evidence of Bloom's guilt.

The import of the trial court's decision with regard to Bloom's motion for a mistrial was that any prejudice caused by the reference to Ellis's polygraph results had been appropriately dealt with through the curative instruction given immediately after the reference, and repeated in written form before deliberations. In other words, the trial court believed that any prejudice was "remedied by other means." *See Collins*, 730 P.2d at

303. As noted above, we will not disturb the trial court's decision "absent a clear showing of an abuse of discretion." *Chastain*, 733 P.2d at 1213. We find no such abuse in this case.

■ We recognize that the trial court did not articulate the proper standard in evaluating whether a mistrial was necessary—that is, the "prejudice too substantial to be remedied by other means" standard—and instead concluded that there was no "manifest necessity to require a mistrial." Manifest necessity is the appropriate standard in cases where the defendant objects to a mistrial, but because Bloom requested a mistrial, manifest necessity was not required. *People v. Baca*, 193 Colo. 9, 12, 562 P.2d 411, 413 (1977). Nevertheless, this error does not change our conclusion that the trial court did not abuse its discretion in denying Bloom's motion for a mistrial. While it did not articulate the appropriate standard, the court did in fact apply it, considering whether the prejudice, if any, could be remedied through means other than a mistrial—that is, by an immediate curative instruction and a subsequent written instruction. Bloom's argument is not based on the fact that the trial court applied the incorrect legal standard, but rather that the court came to the wrong conclusion when it found the curative instructions sufficient to overcome any prejudice. For the reasons stated above, we come to a different conclusion on this point.

### III.

■ Bloom has also raised several issues related to her competency hearings. The main thrust of her argument is that the trial court abused its discretion when it found her competent without the benefit of a formal competency examination. She also argues that she had a statutory right to a formal competency examination and to an examination by an independent doctor. Finally, she argues that the doctrine of the law of the case prohibited the trial court from rescinding its order that Dr. Moran perform a formal competency examination. We disagree and address each argument in turn.

■■ Due process prohibits the trial of an incompetent defendant. *People v. Zapotocky*, 869 P.2d 1234, 1237 (Colo.1994) (citing

*Drope v. Missouri*, 420 U.S. 162, 172, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975)); *Jones v. Dist. Court*, 617 P.2d 803, 806 (Colo.1980) (same). A defendant is incompetent if she "is suffering from a mental disease or defect which renders [her] incapable of understanding the nature and course of the proceedings against [her] or of participating or assisting in [her] defense or cooperating with [her] defense counsel." § 16–8–102(3), C.R.S. (2007); *see also People v. Palmer*, 31 P.3d 863, 866 (Colo.2001) (citing section 16–8–102(3) ).

■ A defendant is presumed to be competent to stand trial. *Palmer*, 31 P.3d at 866; *People v. Stephenson*, 165 P.3d 860, 866 (Colo.App.2007). Thus, "the burden of submitting evidence and the burden of proof by a preponderance of the evidence are upon the party asserting the incompetency of the defendant." § 16–8–111(2), C.R.S. (2007); *see also Palmer*, 31 P.3d at 866 ("[T]he burden to prove incompetency rests with the accused."). Because the defendant's competency is a question of fact, the trial court's determination will be upheld absent an abuse of discretion. *Palmer*, 31 P.3d at 865–66 (citing *Jones*, 617 P.2d at 807–08). To establish an abuse of discretion, the defendant must show "that under the circumstances the trial court's decision was manifestly arbitrary, unreasonable, or unfair." *Stephenson*, 165 P.3d at 866 (citing *People v. Ibarra*, 849 P.2d 33 (Colo.1993)).

In the motion for a competency examination, defense counsel argued that Bloom could not assist in her defense because of her mental and emotional state. Counsel cited Bloom's history of depression and other disorders, and described her emotional breakdowns both in and out of the courtroom. At the hearing on the motion, counsel stated that Bloom had been extremely emotional, which made it difficult to discuss a plea agreement and prepare for trial. Thus, the issue is whether Bloom was incompetent because she was "incapable of . . . participating or assisting in [her] defense." § 16–8–111(2).

Bloom first argues that her competency hearing was inadequate to properly resolve this issue. *See Jones*, 617 P.2d at 806 ("[D]ue process is violated when a trial court

refuses to accord an accused an adequate hearing on his claimed incompetency to stand trial."). In particular, she contends that absent a formal competency examination, the trial court did not have adequate information to make a competency determination. She further contends that Moran's medical evaluation was not a sufficient substitute for a formal examination.

We acknowledge the procedural irregularity in Bloom's competency hearings—namely, that a formal competency examination was not conducted despite being ordered by the trial court. It appears that Judge Kennedy ordered something less than a formal examination, but Judge Kane expressly ordered Moran to formally assess Bloom's competency. Three days later, Judge Kane rescinded the order after Moran stated she could not conduct the formal examination. However, we are mindful that the ultimate issue is whether Bloom was competent, and this issue is a question of fact that depends on the circumstances of the case and is within the trial court's discretion. *See Palmer*, 31 P.3d at 865–66.

■ Under the circumstances of Bloom's case, we conclude that the trial court did not abuse its discretion when it found Bloom competent without first obtaining a formal competency examination. The decision to order a formal competency examination lies within the trial court's discretion. *Zapotocky*, 869 P.2d at 1245 ("[C]ompetency to stand trial is a matter for judicial determination; it is not a finding made on the basis of rubber-stamping the report of a psychiatrist."). In fact, the General Assembly has directed that the trial court "*may* order a competency examination" before a preliminary competency hearing if it "feels that the information available to it is inadequate." § 16–8–111(1) (emphasis added). If a second competency hearing is requested, as it was in this case, then the court "*may* commit the defendant for a competency examination pri-

or to the hearing if adequate psychiatric information is not already available." § 16–8–111(2) (emphasis added).

Here, Judge Kane ultimately elected not to obtain a formal competency examination. At the initial hearing on Bloom's motion for a competency examination, Judge Kennedy found that Bloom had shown no indication of incompetency.[4] At the preliminary competency hearing, Judge Kennedy reiterated his previous findings, ruled that Bloom was competent, and set a date for a final hearing. When Moran later declined to conduct a formal competency examination, Judge Kane found that "her medical evaluation included sufficient evidence with regard to Mrs. Bloom's competency to proceed." Thus, Judge Kane entered a final determination "that the burden of proof has [not] been met here to show that Mrs. Bloom is not competent to proceed."

We agree that Moran's testimony supported a finding of competency. Moran was Bloom's treating psychiatrist and was familiar with Bloom's symptoms and diagnoses. Also, Moran performed a medical evaluation of Bloom just one week before the competency hearings. Although she did not perform a formal competency examination, she stated that she had assessed Bloom's emotional health and mental function, which were the two areas of concern set forth in Bloom's motion for a competency examination. Furthermore, Moran was a licensed psychiatrist who was qualified to opine on competency issues, and in fact, she was called by defense counsel for that very purpose. *Cf. Stephenson*, 165 P.3d at 866–67 (upholding a trial court's reliance on a treating psychiatrist's opinion in support of a competency determination).

Most importantly, Moran testified that she had no concerns about Bloom's competency. She elaborated that Bloom was able to com-

---

**4.** Bloom argues that Judge Kennedy erred by imposing a preliminary burden of proof by the preponderance of the evidence. Bloom cites the following statement by the judge: "It is your burden to establish by a preponderance of the evidence that she is incompetent, and you have not done sufficient assertion even to order a competency evaluation to the Court." However, read in context, this statement simply recognizes

that Bloom would ultimately have to prove incompetency by the preponderance of the evidence and that as a preliminary matter, she had not even asserted a sufficient basis for a competency examination. Moreover, the statement is of no consequence because Bloom requested and received a final competency hearing, at which point the preponderance of the evidence standard did apply.

municate effectively and understand the charges against her. She further opined that although Bloom had some mood swings, she was not "impaired by her moods" or "delusional." Rather, Bloom had indicated that she was capable of working with her defense counsel, that she wanted to prove her innocence, and that she was concerned with the social stigma arising from the charges against her. Moran also testified that Bloom was not "in need of antidepressants," which further undercut Bloom's contention that she needed Lexipro before going to trial.

Moran's testimony was supported by Judge Kennedy's own observations of Bloom's in-court behavior and her interactions with her attorneys. Despite describing Bloom as "near hysterical" during her first court appearance, Judge Kennedy noted that she paid attention to the proceedings and appeared to communicate effectively with her attorneys. Judge Kennedy's observations weigh in favor of a finding of competency. *See Blehm v. People*, 817 P.2d 988, 994 (Colo. 1991) ("Also important on the issue of competency are the accused's general demeanor and interaction with defense counsel and the court during court appearances.").

▮ The other evidence presented was inconclusive. The testimony of the nurse from the jail contained some support for both sides. The nurse described Bloom's ongoing problems with depression and anxiety and her conflicts with other inmates, but none of these concerns was serious enough to warrant a mental health examination. Also, the nurse was not qualified to testify about competency issues, and she was unaware of any concerns about Bloom's legal competency. Although defense counsel questioned Bloom's competency, *see Blehm*, 817 P.2d at 994 (citing defense counsel's observations as a factor in the competency determination), "due process does not require trial courts to 'accept without questioning a lawyer's representations concerning the competence of his client.'" *People v. Kilgore*, 992 P.2d 661, 663 (Colo.App.1999) (quoting *People v. Morino*, 743 P.2d 49, 51 (Colo.App.1987)).

At bottom, Judge Kane's determination that Bloom was competent to proceed was supported by Dr. Moran's testimony, as well as by Judge Kennedy's observations. Because Bloom failed to carry her burden of proof, we perceive no abuse of discretion in the trial court's determination.

▮ Bloom's second argument is that section 16–8–111 does not authorize the trial court to order anything less than a formal competency examination, and that the trial court therefore abused its discretion in this case by relying on Moran's medical evaluation, which was not a formal examination. However, section 16–8–111 contains no such requirement. Rather, it defines "competency examination" more broadly to include "a court-ordered examination of a defendant ... directed to developing information relevant to a determination of [her] competency to proceed." § 16–8–102(1). In short, the trial court has the discretion to order a competency examination, and the statute does not restrict this discretion to formal examinations. Thus, the trial court did not abuse its discretion by relying on Moran's medical evaluation in lieu of a formal competency examination.

▮ As a corollary to this argument, Bloom contends that she was entitled to an independent competency examination by either the state hospital or by a psychiatrist of her own choosing. However, the General Assembly has expressly granted the trial court discretion to choose the facility that will conduct a defendant's competency examination. § 16–8–106(1), C.R.S. (2007) ("The defendant may be committed for such examination to the [state hospital], the place where he or she is in custody, or such other public institution designated by the court."). Furthermore, the defendant must show good cause to obtain an examination by a doctor of her own choosing. *Palmer*, 31 P.3d at 871 ("[A] paying defendant wishing to exercise his right to second competency evaluation by an expert of his own choosing must nonetheless make a showing of good cause under section 16–8–106."); *Massey v. Dist. Court*, 180 Colo. 359, 364, 506 P.2d 128, 130 (1973) (same). Here, Bloom failed to establish a basis for any examination, by her own doctor or otherwise.

▮ Bloom's final argument is that the doctrine of the law of the case prohibited the trial court from rescinding its order for a

formal competency examination. However, the doctrine is discretionary and does not apply to a court's preliminary decisions. *Paratransit Risk Retention Group Ins. Co. v. Kamins*, 160 P.3d 307, 313 (Colo.App. 2007); *DeForrest v. City of Cherry Hills Vill.*, 990 P.2d 1139, 1142 (Colo.App.1999); *Governor's Ranch Prof'l Ctr. v. Mercy of Colo., Inc.*, 793 P.2d 648, 650 (Colo.App.1990). Here, the trial court continued Bloom's final competency hearing and ordered a formal competency examination, meaning that the court initially thought it lacked adequate psychiatric information to make a final determination. *See* § 16–8–111(2) (giving the court discretion to order a competency examination before a final determination "if adequate psychiatric information is not already available"). However, when it entered the final competency determination, the trial court reconsidered its initial conclusion and stated that a formal competency examination was not necessary because Moran's medical evaluation provided "sufficient evidence" of Bloom's competency. Because the court's initial conclusion about the need for a formal examination was a preliminary decision, the doctrine of the law of the case did not bar the court from reconsidering its conclusion and entering a final competency determination based on Moran's evaluation.

In sum, we hold that the trial court did not abuse its discretion in finding Bloom competent to proceed. We further hold that the trial court's failure to obtain a formal competency examination did not render Bloom's competency hearing inadequate under the circumstances because there was sufficient other evidence establishing Bloom's competency.

## IV.

We hold that the trial court did not violate Bloom's constitutional rights or otherwise abuse its discretion. Therefore, we affirm the opinion of the court of appeals.