# January Term, 1946

## No. 15,609.

### ROBINSON *v*. THE PEOPLE.
(165 P. [2d] 763)

Decided January 14, 1946.   Rehearing denied February 4, 1946.

Mr. MORTON M. DAVID, for plaintiff in error.

Mr. H. LAWRENCE HINKLEY, Attorney General, Mr. DUKE W. DUNBAR, Deputy, Mr. JAMES S. HENDERSON, Assistant, for the people.

*En Banc.*

MR. JUSTICE BURKE delivered the opinion of the court.

PLAINTIFF in error, hereinafter referred to as defendant, was convicted of first degree murder and sentenced to life imprisonment. To review that judgment he prosecutes this writ and argues the following assignments: 1. Limitation of redirect examination of a witness. 2. Permitting partial use of the extrajudicial statement of a witness. 3. Instructing on first degree murder. 4. Instructing on intent. 5. Instructing on flight. Other assignments, not argued, deserve no notice

and it is doubtful if any of the foregoing do, save the last.

Some time after midnight a social gathering, held at the residence of one Ridge, dissolved. All the participants, including defendant and his victim Hicks and their wives, were negroes. Some intoxicating liquor had been consumed and there was evidence that one of the participants was "uproariously drunk." The tongues of others were sufficiently loosened that they freely discussed charges involving the conduct of Hicks and defendant's wife. As a result the latter was among the first to leave the house and sat in defendant's car near by. Some ten feet in its rear stood the car of Hicks, now occupied by his wife and two of her friends. The current scandal had been mentioned inside by defendant and Hicks and the former testified that the latter agreed to "apologize" to Mrs. Robinson. In any event the two men came out together. Hicks took the driver's seat in his car the door of which was closed and the window down. Defendant approached his own car and then returned to that of Hicks who was preparing to depart. After a brief conversation held through the open window defendant took a pistol from his inside coat pocket. Very shortly its discharge followed whereupon Hicks scrambled out of his car on the right-hand side, passed around the rear and disappeared. It later developed that he went a short distance down an alley and fell dead. Defendant and his wife drove hastily to their home, taking therefrom and secreting in the home of a friend the young daughter (by a former marriage) of the wife. Approximately two hours after the shooting they arrived at police headquarters. In answer to inquiries there made defendant learned that Hicks was dead. Having identified himself as being in some way connected with the tragedy defendant was taken into custody. Later he was questioned and made a detailed statement which was written down but not signed, and his wife made a similar one which was. On the trial,

defendant testified that when he came to the Hick's car he insisted on the promised apology whereupon Hicks, who was admittedly unarmed, seized him through the window and attempted to abstract his pistol. That to frustrate that attempt defendant himself took the weapon from his pocket. That while they were contending for its possession and both had hold of it, an accidental discharge occurred. However, he had prior thereto told his wife and others that he had fired high to frighten Hicks. Both theories seem refuted by the facts that the bullet went straight through the victim's body transversly, entering the left arm pit and out the right side, and that there were no powder burns on his clothing.

[1] 1. The redirect examination, unduly limited as contended, was that of defendant's wife and related to her activity as a newspaper correspondent. This, like much examination and cross-examination as to whether she was white or colored, was wholly immaterial and so entirely disconnected with any issue in the case as to make prejudice impossible.

2. The statement referred to was that made by defendant's wife at the police department. In cross-examination she was interrogated as to portions thereof clearly contradictory of, or inconsistent with, testimony given by her on the stand. Of course the district attorney was not obliged to put in what might have been self-serving declarations in order to show contradictions on material matters. However, it is a complete answer to the assignment that the record shows the offer by the district attorney of the entire statement and its rejection by the court on the objection of counsel for defendant. It is not in the record hence all presumptions favor the ruling.

3. The foregoing statement of facts demonstrates that failure to instruct on first degree murder would have been gross error. It is asserted that malice and premeditation are not shown. If the rather fantastic

theory of the defendant be discarded — and under the evidence the jury was entitled to discard it — the only choice remaining is between malice and premeditation on the one hand and a miracle on the other.

■ 4. The instruction here complained of was for all practical purposes the usual stock instruction on intent, always proper in cases such as this but frequently, as here, unnecessary.

■■ 5. Instruction No. 23 reads as follows: "If you find from the evidence beyond a reasonable doubt that the crime charged in the information was committed by some person, and that immediately after such crime was committed the defendant fled, such flight would be a circumstance, not sufficient in itself to establish the guilt of the defendant, but a circumstance which you may consider, in connection with all the other facts and circumstances proven at the trial, in determining the question of the guilt .or innocence of the defendant. It is for you to determine from the evidence whether such flight was caused by a consciousness of guilt or by some other and innocent motive."

The objection made to this instruction was as follows: "Defendant objects to instruction No. 23 on flight on the ground that the evidence shows that the defendant went to the police headquarters and surrendered; that the defendant had surrendered prior to the time of the arrival of the officers at the police headquarters with the witnesses in said cause; and, under the conditions, the same is incompetent, irrelevant and immaterial and highly prejudicial to the defendant." It should here be observed that instruction No. 23 is clearly taken from a case in which the identity of the perpetrator was in question, hence that portion of the instruction was inapplicable, but wholly immaterial and entirely without prejudice since here, if a crime was committed, the identity of the perpetrator was unquestioned. If there was evidence of flight the remainder of the instruction was proper. The fact that defendant surrendered was,

under the circumstances, wholly immaterial. Such a surrender often takes place after flight and concealment. It will thus be observed that the only proper objection to the instruction was not made, hence, under a well established rule, the objection that was made is entitled to no consideration. We elect however to examine the propriety of this instruction under the undisputed facts of the case.

It may here, however, be further observed that, according to reason and the best considered authorities, such an instruction is rarely advisable and should never be given unless the peculiar facts of the case appear to make it essential. It generally impinges upon the rule that particular portions of the evidence should not be singled out and emphasized by special instructions. Again, most of the authorities which assume to enumerate the essentials of this element are based upon the peculiar facts of a given case and may not be taken as generally applicable to all. If, in the instant case, defendant had reason to believe that he had committed a crime, that his identity was known, that his pursuit and apprehension would probably ensue, and that he fled or concealed himself for any length of time to frustrate his apprehension, an instruction on flight would be devoid of error. What were the facts and what was the jury entitled to believe from the evidence?

From the course of the bullet the jury could well conclude that defendant shot straight at his victim with felonious intent. The absence of powder burns and the course of the bullet as above mentioned refute his story of a struggle and a shot fired at close contact. His story that the concealment of his wife's daughter was to prevent her harm or entanglement with the police, tends to refute his claim of an accident. His statement to his wife and others that he fired high to frighten Hicks does not square with the facts. The friend with whom the daughter was left and his own wife both advised him against flight. Had he and his wife remained at their

home the daughter would have been safe and he could easily have been located. From one to two hours elapsed between the time of the tragedy and his appearance at police headquarters. The evidence is that, during that time they drove "around and around"; that they drove "everywhere"; that they drove "around again," from all of which the jury was entitled to believe that he was for the time being concealing himself and contemplating absconding, and that he was finally persuaded to the contrary by the advice of his wife and friend. Had the officers been promptly advised of the tragedy and the identity of the defendant and gone to his home where they should have expected to find him, and where he would have been but for the facts above recited, they would not have been able to locate him and during that time at least he was concealing himself from pursuit. Add now to the evidence already recited the further facts that the explanation of defendant and his wife as to how he happened to be armed is unconvincing, as is the further fact that Hicks was trying to take from him a weapon of whose presence he could have had no knowledge; that as defendant and his wife were driving about the city they discussed the trouble they were in, including their recent purchase of a home whose security seemed now imperiled, and the jurors were clearly entitled to believe that defendant knew he had committed a felony and was certain to be called to account. Under all these circumstances, and even assuming that there was a valid objection to instruction No. 23, the material portion of it, and the only portion having any application to the controversy, was clearly proper.

Of the many authorities cited by counsel we refer to none. Those applicable are not contrary to the foregoing. Others are clearly inapplicable because of divergent facts. The general principles relied upon herein are well recognized and undisputed. Any attempt to diagnose the adjudicated cases and reconcile and apply them would be but a waste of time and of no assistance to the

profession. Under the undisputed evidence this defendant was clearly guilty of a first degree murder. His defense of an accident is, in the light of unquestioned circumstances, flimsy and unbelievable.

Finding no reversible error in the record the judgment is affirmed.

MR. CHIEF JUSTICE KNOUS, MR. JUSTICE HILLIARD and MR. JUSTICE ALTER dissent.

MR. CHIEF JUSTICE KNOUS dissenting.

I believe the majority wrong in deciding that the giving of the instruction on flight did not constitute reversible error.

The challenged instruction, No. 23, is quoted at length in the opinion of the court and in the interest of brevity will not be repeated herein.

As I view, this instruction denied defendant a fair trial, first, because of its improper form and, secondly, because the evidence did not warrant the giving of any instruction on the subject of flight.

The majority concedes the correctness of the first proposition, but denies reversal for the error upon the extremely technical basis that defendant's objection to the instruction was not sufficiently comprehensive to include this specification.

Condemning the form of the instruction, the court states: "Instruction No. 23 is clearly taken from a case in which the identity of the perpetrator was in question, hence that portion of the instruction was inapplicable," but then goes on to say: "If there was evidence of flight the remainder of the instruction was proper." However, the opinion does not attempt to specifically segregate the "proper" language from the "inapplicable." In fact, as will appear from a reading of the instruction, such a feat would approach the impossible. Nor does the court, in its opinion, profess to say how it may be presumed that the jury devised or followed a sound formula for

the elimination of the legal error in this concededly duplicitous instruction. That this fallacy has attended the thinking of the majority throughout, is made clear by the language of the ultimate conclusion of affirmance, wherein it is said: "Under all these circumstances, and even assuming that there was a valid objection to Instruction No. 23, the material portion of it, and the only portion having any application to the controversy, was clearly proper."

Concerning the result of giving an *inapplicable* instruction, "It has been repeatedly held by the appellate courts of this state that it is error to give an instruction, however correct it may be as an abstract proposition of law, unless it bears upon and is connected with the issue in the case and is predicated upon competent evidence submitted to the jury, to which evidence the jury may apply it. Such instructions tend to mislead the minds of the jury from the issue involved." *Fay v. Fort Collins*, 40 Colo. 262, 90 Pac. 512. The same rule attains where the charge contains two conflicting propositions of law. *Clare v. People*, 9 Colo. 122, 125, 10 Pac. 799.

Considering that a sentence of life imprisonment was imposed on defendant as the result of a verdict of a jury, at least erroneously instructed in part, it would seem fitting that our court under the compassionate view adopted in *Reppin v. People,* 95 Colo. 192, 34 P. (2d) 71, and followed in *McRae v. People,* 101 Colo. 155, 71 P. (2d) 1042; *Hoppal v. People,* 102 Colo. 524, 81 P. (2d) 381; *Paine v. People,* 106 Colo. 258, 103 P. (2d) 686, and *Leech v. People,* 112 Colo. 120, 146 P. (2d) 346, wherein errors not objected to below were noticed, should order a new trial herein on this point alone.

The shooting occurred at approximately 2:15 a.m. in the street in front of 1615 East 22nd avenue where deceased resided. Immediately after the single shot was fired, Hicks, saying only, "Let me out of there," precipitately left his car and ran away in the darkness. None of the other three occupants of decedent's car,

including his widow, knew at the time that a bullet had struck deceased and so testified. Evidence in the record discloses that immediately after the discharge of the gun, defendant, while all of the occupants of decedent's car•still were therein, asked "If anybody was hit?," but received no answer. Defendant testified that while still standing by decedent's car, he further said, without contradiction being offered, "I don't think anyone was hit." Defendant then returned to his car and drove to his residence at 510 29th street. Decedent's widow, still believing her husband unhurt, hurried to their home to unlock the door so that he might enter. When he did not appear, and before making the search which ended in the discovery of his body in an alley, she went to a nearby residence to ascertain whether decedent had gone in there. The officers were called at about 2:30 a.m., and a police broadcast put on the air at 2:35 a.m. The officers who had been assigned to investigate the shooting returned to police headquarters at 3:45 a.m., but before that time defendant had reported there, identified himself as having been implicated in the affair, and upon being advised, in response to his inquiry, that Hicks had been shot, submitted to arrest. It is my belief that the foregoing undisputed testimony discloses certain discrepancies in the time factors as generalized in the court opinion and demonstrates that the inference of the majority that at the time of his departure defendant *knew* that Hicks had been shot is in opposition to the testimony of every eye witness.

Upon the arrival of defendant and his wife at their home following the shooting, defendant's fourteen year old step-daughter was aroused from sleep, and after she had dressed, the three drove to the home of Richard Albertis, at 1219 28th street, in whose custody the child was left. This move was made at the insistence of Mrs. Robinson and seems to have been induced by repeated remarks of deceased in the argument preceding the shooting expressing his amorous desires toward the girl.

Defendant paused at Albertis' for a conversation with the latter, the duration of which is not stated in units of time, but which, from the tenor as recited in the record, must have consumed a considerable period. Thereafter defendant proceeded to police headquarters. Before going in he and his wife sat in their car and talked for at least fifteen minutes. The evidence does not show the route taken, but it is undisputed that not more than "an hour or an hour and a half" elapsed between the moment the shot was fired and the time of the voluntary appearance of defendant at police headquarters. During this interval there was no pursuit of anyone by the police nor had they so much as called at defendant's residence — well known to every eye witness to the shooting — in an effort to arrest him. Further, I am unable to find in the record any evidence supporting the statement of the majority opinion that, "The friend with whom the daughter was left and his own wife both advised him against flight," or that the matter of projected flight was so much as mentioned or discussed in their conversations.

The question here confronting us, the second in the order adopted by the majority opinion, is whether the foregoing evidence was sufficient to warrant the giving of an instruction on flight. If it was not, reversible error occurred. Such is made certain by our opinion in *Orin v. People*, 68 Colo. 1, 188 Pac. 1114, wherein it is stated: "In the absence of any testimony showing any attempt, effort or purpose on the part of the defendant to flee, *this instruction [on flight] was highly prejudicial and sufficient in itself to cause a reversal of the case.*" See, also, *State v. Goodwin* (Mo.), 217 S. W. 264, 53 Am. Jur., p. 537, §710; 23 C. J. S., p. 779, §1220, and particularly note (1) first column, page 780 of the latter work. There are no exceptions to this rule. A breach thereof is recognized universally as denying a defendant the fair trial guaranteed by law.

Viewed in the light of the authorities, I am satisfied

the evidence of defendant's conduct following the shooting, which I believe is fairly stated above, furnished no sufficient basis for the giving of the questioned instruction.

In the development of the law, the importance attached to flight as evidence of guilt has gradually diminished. Under the old common law a man who fled to avoid being tried for felony forfeited all his goods even though he was acquitted; and the jury was always charged to inquire not only whether the prisoner was guilty of the offense, but also whether he fled because of it, and, if so, what property he had. See, *Hickory v. United States*, 160 U. S. 408, 16 Sup. Ct. 327, 40 L. Ed. 474. The latter practice finally was abolished by statute in England (Stat. 7 & 8, Geo. IV. c. 28, §5).

The modern tendency has been to regard flight as evidence of guilt only if it appears to be a deliberate attempt to avoid arrest or trial. See, 25 A. L. R., pp. 886, 887. No such intention by defendant properly may be inferred from the evidence herein. In fact, defendant, instead of seeking to avoid arrest accelerated it by reporting at the police station. This intent was not diluted by the circumstance, to which Mrs. Robinson testified, that in the few minutes elapsing between the departure from Albertis' and arrival at the police station she and defendant drove "around and around" the streets of Denver. The primary definition of "flee" as given by Webster is, "to run away from." How then can it be held that proceeding to police headquarters, even by a circuitous route, was a flight from the officers of the law? It has been held that the mere fact that defendant fled from the place where a homicide was committed, immediately thereafter, and went to his home, not more than one-half mile distant, does not authorize the giving of an instruction on flight. *State v. Hopper*, 142 Mo. 478, 44 S. W. 272. See, also, *People v. Goodwin*, 202 Cal. 527, 261 Pac. 1009, 1014.

In Iowa it has been held on numerous occasions (See,

*State v. Seymour,* 94 Ia. 699, 63 N. W. 661, as typical), that the giving of an instruction on flight is proper only where: (1) The defendant knows that he was accused or suspected of crime, and, (2) that he fled to avoid arrest therefor.

It is to be recalled that herein there was no testimony whatosever that defendant knew at the time he left the scene of the shooting that Hicks had been injured in any degree as a result of the shot. In the light of this evidence how can it properly be held with reason that defendant's departure from the scene resulted from an impulsive reaction to a consciousness of guilt of the crime for which he subsequently was tried? In this connection it is of interest to note that in *People v. Jones,* 160 Cal. 358, 117 Pac. 176, 181, the court stated that, in order to be indicative of a guilty consciousness, a flight must be made by one who knows a crime has been committed and that he is charged therewith. See, also, to the same effect, *People v. Sainz,* 162 Cal. 242, 121 Pac. 922, and *People v. Lem Deo,* 132 Cal. 199, 64 Pac. 265. Under the evidence, the only inquiry from the police which might have been anticipated by defendant at the time he left the scene would have related to the discharge of a firearm. If such apprehension was a factor inducing his departure, the circumstance is without pertinency herein since, "Flight because of one crime, * * * is not admissible as evidence of guilt of another crime." 20 Am. Jur., p. 273, §293.

The foregoing I believe is indicative of the state of the law on the subject. Notwithstanding, the majority has pronounced that the giving of the undefined "material portion" of Instruction No. 23 "was clearly proper." *Not a single case supporting such conclusion is cited in the court opinion.* In explanation of this unusual course, which seems inadequate in the light of the precedents hereinabove mentioned, the court in the majority opinion states, "Of the many authorities cited by counsel we refer to none. Those applicable are not con-

trary to the foregoing. Others are clearly inapplicable because of divergent facts. The general principles relied upon herein are well recognized and undisputed. Any attempt to diagnose the adjudicated cases and reconcile and apply them would be but a waste of time and of no assistance to the profession. Under the undisputed evidence this defendant was clearly guilty of a first degree murder."

Unmistakably, I think, the real basis of affirmance is expressed in the last sentence above. Such is further confirmed by the circumstance that the reasoning of the court opinion seems to be grounded preponderantly on the marshalling of the testimony in a hypothetical demonstration of the ultimate guilt of the defendant rather than in passing it in critical review to determine whether the transcript contained sufficient evidence of flight to justify the giving of Instruction No. 23. By this process, instead of being determined appropriately by the criteria of the adjudicated requirements for a fair trial, the reversible effect to be given a patent error is made to rest upon the view of the appellate court on the question of the guilt of the accused.

This procedure is not warranted by the law. Such is made graphically clear by the language of the Supreme Court of California in its opinion in the recent case of *People v. Sarazzawski*, 27 Cal. (2d) 7, 161 P. (2d) 934, wherein it is said: "There is no question that the evidence amply supports the verdict and judgment but, regrettably, we find in the record several incidents which should not have occurred in a fair and orderly trial. At least two of such incidents are matters of such grave moment as to amount to substantial departures from the established elements of a fair trial, to which every person charged with crime, no matter how rich or poor, virtuous or debased, is entitled. When a defendant has been denied any essential element of a fair trial or due process, even the broad saving provisions of section 4½ of article VI of our state Constitution cannot remedy

the vice and the judgment cannot stand. People v. Mahoney, 201 Cal. 618, 627, 258 P. 607; People v. Adams, 76 Cal. App. 178, 186-187, 244 P. 106; People v. Gilliland, 39 Cal. App. 2d 250, 264, 103 P. 2d 179; People v. Duvernay, 43 Cal. App. 2d 823, 829, 111 P. 2d 659. That section was not designed to 'abrogate the guaranties accorded persons accused of crime by other parts of the same Constitution or to overthrow all statutory rules of procedure and evidence in criminal cases. When we speak of administering "justice" in criminal cases, under the English or American system of procedure, we mean something more than merely ascertaining whether an accused is or is not guilty. It is an essential part of justice that the question of guilt or innocence shall be determined by an orderly legal procedure, in which the substantial rights belonging to defendants shall be respected.' People v. O'Bryan, 165 Cal. 55, 65, 130 P. 1042, 1056, opinion by Mr. Justice Sloss; People v. Wilson, 23 Cal. App. 513, 524, 138 P. 971."

One of the incidents referred to in such opinion was the giving of an erroneous instruction; the other had to do with the denial of a continuance to permit oral argument by defendants' counsel on the motion for a new trial.

Beyond those in that case, the circumstances here seem to me to magnify the prejudice to the defendant arising from the giving of the instruction. Defendant before and at the trial admitted that the deceased came to his death as the result of a gun shot wound inflicted by a pistol held in defendant's hand. Admittedly the shooting was preceded by a heated controversy. There were a number of eyewitnesses to the fact. Thus, the primary question for the jury was whether the conceded homicide was unlawful or justifiable or excusable. The mental states of the participants were matters of concern thereto. This being so, the improper calling of the attention of the jury to defendant's departure from the scene of the shooting, with the admonition that such

was a circumstance they might consider in connection with the other evidence in determining the guilt or innocence of defendant, including inferentially their return of the degree of the crime, if defendant was found guilty, potentially could not have been other than prejudicial to his cause. See, *Orin v. People, supra.* All of the testimony in examination was admissible as part of the res gestae and was so considerable by the jury. The vice, and prejudice to the defendant, arose from the mistake of the court in singling out and emphasizing the fact of his departure, by an admittedly inaccurate special instruction and in so disturbing the delicate poise of the scales of justice necessarily incident to a fair trial.

Pertinently to this point, it has been held that flight by the defendant following a homicide does not prove or tend to prove, that defendant acted with deliberation and premeditation and that, as a result, an instruction on flight is erroneous where a defendant's participation was not in issue. *State v. Foster,* 130 N. C. 666, 41 S. E. 284, 89 Am. St. Rep. 876.

In this view our function is not to resolve the ultimate question of defendant's guilt or innocence and decide procedural points relatively on the basis of our personal views on that question, but to determine whether defendant had a trial in the form guaranteed by law. For the reasons given I am satisfied he did not, and so believe the judgment should be reversed and a new trial ordered.

I am authorized to state that Mr. Justice Hilliard and Mr. Justice Alter concur in the views expressed herein.