22CA1727 Peo v Williams 11-26-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 22CA1727
Jefferson County District Court No. 21CR2438
Honorable Diego G. Hunt, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Destiny Rose Williams,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE SCHUTZ
J. Jones and Grove, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced November 26, 2025

Philip J. Weiser, Attorney General, Carmen Moraleda, Senior Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Meredith K. Rose, Deputy
State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1　　Defendant, Destiny Rose Williams, appeals the trial court's judgment of conviction entered on a jury's verdict finding her guilty of second degree murder.  We affirm.

## I.　Background and Procedural History

### A.　Shooting and Arrest

¶ 2　　Williams testified that she and the victim, Camren Tomlinson, started dating in summer 2021.  They became familiar with each other through mutual friends at the tattoo parlor that she ran.  Williams's business was largely cash based, and she worked late hours, so she often carried a .38 caliber handgun and was experienced in handling it.

¶ 3　　Williams testified that she became concerned a few weeks into their relationship after noticing that Tomlinson's behavior drastically changed within a short period; specifically, he became more aggressive, his sleeping patterns changed, and he abruptly quit his job.  When Williams found drug paraphernalia at her home she confronted Tomlinson, and he admitted that he was using and dealing drugs.

¶ 4　　Williams stated that, after the revelation, the couple frequently argued because she wanted him to stop his drug activity.

¶ 5    In late August 2021, Williams and Tomlinson met at a local bar on their motorcycles.  They had a disagreement, and Williams became upset with Tomlinson after realizing that he had left the bar without her.  At around 2 a.m., they started arguing via text; she sent him the following message: "Fucking coward I love to put men like you in their fucking place."  At 2:32 a.m. she also sent him a message that said, "Thanks for pushing the final button."  She later went home.  Tomlinson called her and they started arguing again.  They arranged to meet in a gas station parking lot.  Williams testified that she drove her SUV instead of her motorcycle because she was emotional and concerned that she would not be safely visible at night.  Williams's handgun was in the center console of the SUV.

¶ 6    Tomlinson arrived at the gas station on his motorcycle.  Williams arrived a few minutes later, and they started arguing in her SUV.  Williams got frustrated and left the vehicle.  Tomlinson, who was taller and at least forty pounds heavier than Williams, followed her on the sidewalk and violently grabbed her left arm.  Williams felt a "pop" in her shoulder and a burning, stabbing pain (it was later revealed that she suffered a dislocated shoulder).  She

2

started screaming and Tomlinson allegedly squeezed her throat, telling her to "shut . . . up before one of them [catches] a . . . DV."

¶ 7 She testified that while holding her keys in her right hand, she punched Tomlinson in the face, hurried back to the SUV, and drove away. At some point she realized that Tomlinson was following her on his motorcycle. She testified that she slammed on her brakes as she approached a curve, which resulted in Tomlinson crashing his bike. He was not wearing a helmet or protective body gear. She got out of the vehicle and asked if he needed medical assistance or help picking up the bike. Tomlinson yelled at her to "fucking leave," so she left in the SUV.

¶ 8 Williams then turned around, purportedly because she was concerned that Tomlinson may have been seriously injured. When she arrived at the crash scene, she saw Tomlinson pacing and seemingly enraged. She stayed in the SUV. Tomlinson thew his goggles at her, striking the door jamb.

¶ 9 Williams testified that Tomlinson then rushed toward the SUV with his arms and hands outstretched. She stated that she pulled her handgun from the center console, and when Tomlinson was about three feet from her, she fired a single shot in his direction.

Williams stated that Tomlinson had a look in his eyes that she had never seen before and she was afraid he would kill her.

¶ 10    Williams testified that, after firing the shot, she panicked, drove away, called Devon Garduno (her friend), and packed a bag.

¶ 11    When he arrived, Garduno observed Tomlinson lying on his back, bleeding profusely, and unresponsive.  Garduno put Tomlinson into the back seat of his car and transported him to a parking lot near the front of a hospital and called 911.  Tomlinson eventually died from the gunshot wound.

¶ 12    Williams and Garduno subsequently drove to Fort Morgan, where they stayed in a hotel.  Garduno testified that while driving there, Williams concealed her phone in a potato chip bag so it could not be tracked.  After speaking with her father, Williams eventually turned herself in to law enforcement.  In a subsequent police interview, Williams confessed to shooting Tomlinson.  She and Garduno were both arrested for their roles in Tomlinson's death.  The prosecution charged Williams with first degree murder, tampering with a deceased human body, and two crime of violence counts.

## B. Trial and Conviction

¶ 13    Williams's counsel filed a pretrial motion to allow a defense expert to be present and observe the prosecution's anticipated testing of the shirt that Tomlinson was wearing when he was shot. Defense counsel argued that the prosecution's testing might be consumptive or destructive to evidence that was critical to the defense. The prosecution responded by assuring the court and defense that it would comply with its obligations under section 16-3-309(1), C.R.S. 2025, which requires the prosecution's agents, when handling evidence that they reasonably foresee may be favorable to the defense, to act in "good faith and in accordance with regular procedures designed to preserve the evidence." The trial court denied Williams's motion but required the prosecution to provide her counsel notice of any testing that presented a risk of being consumptive or destructive.

¶ 14    The prosecution subsequently sent Tomlinson's shirt to the Colorado Bureau of Investigation (CBI) for forensic testing, without providing notice to the defense. The CBI testing damaged the shirt in a manner that prevented the defense expert from conducting planned tests. As a result, Williams moved to dismiss the case.

The court denied the motion and the matter proceeded to trial, where Williams testified that she acted in self-defense.

¶ 15 The jury found Williams guilty of second degree murder but acquitted her of the remaining charges. The court sentenced her to twenty-five years in the custody of the Department of Corrections.

## II. The Destruction of Evidence

¶ 16 Williams contends that the trial court deprived her of due process by denying her motion to dismiss because the CBI's testing destroyed evidence that the prosecution knew or should have known was exculpatory or potentially exculpatory.

## A. Additional Facts

¶ 17 The defense engaged Richard Tewes as a crime scene expert. The defense explained that the "bullet wipe[1]" was removed during the CBI's testing and moved to dismiss the case. Specifically, the motion to dismiss alleged that "Tewes'[s] analysis of the shirt worn [was] absolutely vital to [Williams's] defense" and that Tewes had planned to "conduct analysis of the fibers of the shirt" and "use the shirt (in particular its[] bullet hole) to reconstruct the crime scene

---

[1] "Bullet wipe" refers to the black ring of residue that is sometimes present around a bullet hole.

using mannequins, a model of the car, and firing rods." Williams also asserted that "bullet ring residue would have been used to give 'the elliptical angle of the bullet upon contact'" and that the "removal of this material also render[ed] useless any microscopic examination of the bullet hole" to independently determine the distance from which the fatal shot had been fired.

¶ 18 Based on the consumption or destruction of this evidence, Williams moved to dismiss the case or, alternatively, for dismissal of the first degree murder charge, exclusion of testimony from the prosecution's expert witness, and the giving of an instruction to the jury that the prosecution had destroyed evidence, thereby precluding the defense's ability to independently test Tomlinson's shirt.

¶ 19 Relying on *Arizona v. Youngblood*, 488 U.S. 51 (1988), the trial court denied Williams's motion, reasoning as follows:

> [T]he notice the People had was with respect to testing of the bullet hole to reconstruct the crime scene using mannequins and model of the car and firing rods, and not any reference specifically to the angle of the bullet wipe here. So even to the extent that there might be the consumption of this bullet wipe based on the chemical tests that have been administered, the defense has not been deprived of the ability

> to reconstruct the incident here, and they haven't shown how that ring would be exculpatory or what the exculpatory value of that evidence would be, and . . . they failed to show any bad faith on the [part of the] People as well given that the issue seems to be different than what was originally raised with the Court with respect to that evidence.

## B. Standard of Review and Applicable Law

¶ 20 We review preserved due process contentions de novo. *People v. Burlingame*, 2019 COA 17, ¶ 11. The Due Process Clause of the United States Constitution requires the state to disclose favorable evidence that is material to a defendant's guilt or punishment. *People v. Braunthal*, 31 P.3d 167, 172 (Colo. 2001). "In considering whether the prosecution's acts amount to a suppression of evidence, . . . 'when evidence can be collected and preserved in the performance of routine procedures by state agents, the failure to do so is tantamount to suppression of the evidence.'" *People v. Greathouse*, 742 P.2d 334, 337 (Colo. 1987) (quoting *People ex rel. Gallagher v. Dist. Ct.*, 656 P.2d 1287, 1291 (Colo. 1983)). Thus, the prosecution must preserve evidence that may be favorable to the accused. *Braunthal*, 31 P.3d at 172 (citing *Brady v. Maryland*, 373 U.S. 83 (1963)). To establish a violation of the prosecution's duty to

8

preserve exculpatory evidence, a defendant must show that (1) the state destroyed the evidence; (2) the evidence possessed exculpatory value that was apparent before it was lost or destroyed; and (3) comparable evidence was not available through reasonable means. *Id.* at 172-73 (citing *California v. Trombetta*, 467 U.S. 479, 489 (1984)).

¶ 21    If the evidence in question was not apparently exculpatory but rather only potentially useful to the defense, to establish a due process violation, a defendant must demonstrate that the state suppressed or destroyed the evidence in bad faith. *See Youngblood*, 488 U.S. at 57-58; *People v. Wyman*, 788 P.2d 1278, 1279 (Colo. 1990).

¶ 22    If a defendant establishes that a due process violation has occurred because of the destruction of evidence, the court may impose various remedial sanctions, including dismissal of the case, dismissal of particular claims, or other less severe sanctions. *People v. Sheppard*, 701 P.2d 49, 55 (Colo. 1985).

### C.    Analysis

¶ 23    Williams contends that Tewes's ability to conduct bullet wipe testing was essential because it could have revealed the position of

Tomlinson's body when she shot him and therefore could have supported her defense that she fired the handgun at close range and in self-defense. The People counter that the trial court correctly denied the motion because Williams could not show that the prosecution's failure to preserve the evidence met the *Trombetta* prongs.

### 1. State Action

¶ 24     The parties dispute whether the State's testing was wholly versus partially consumptive. But the People do not seem to dispute that the State's testing precluded Tewes from testing the bullet wipe. Thus, we assume that additional testing of the bullet wipe was rendered impossible by the State's action.

### 2. Exculpatory Value of the Bullet Wipe

¶ 25     To meet the exculpatory prong of *Trombetta,* a defendant must show that the evidence would have been materially relevant to the defendant's theory of the case. *Greathouse,* 742 P.2d at 338. But mere speculation about what the bullet wipe would have shown is not sufficient to meet the exculpatory prong. *See People v. Young,* 2014 COA 169, ¶ 74 (The Due Process Clause "does not invariably require a state to preserve evidence which *might* be favorable to the

10

accused when dealing with evidentiary material 'of which no more can be said than it *could have been subjected to tests*.'" (quoting *Wyman*, 788 P.2d at 1279)). Nor is it met through conclusory assertions. *See People v. Eason*, 2022 COA 54, ¶ 48.

¶ 26 Williams contends that the bullet wipe would have helped to determine the position of Tomlinson's body at the time of the shooting. Tewes conceded that other evidence established the bullet's trajectory through Tomlinson's body but maintained that the bullet wipe would have allowed him to make a more precise calculation of Tomlinson's body angle.

¶ 27 But Tewes did not provide testimony supporting a conclusion that the bullet wipe would have led to trajectory evidence materially different from that which was available through the report measuring the bullet's trajectory through Tomlinson's body. The following exchange with the trial court is illustrative:

> THE COURT: What [will the bullet wipe] show you independent of the information that you have as it relates to reconstruction?
>
> [TEWES]: It's one more piece of the puzzle, Your Honor. The angle that it strikes the shirt gives you the positioning of the shirt. You can have a lot of different movements of the body.

THE COURT: What is the significance of the position of the shirt as it relates to your assessment?

[TEWES]: That, I can't tell you, because I can't do the exam.

¶ 28     But even if we assume that the bullet wipe could have provided relevant information with respect to the posture of Tomlinson's body, Williams does not explain how Tomlinson's body position would have materially advanced her self-defense theory beyond the evidence that was already in the record. *See People v. Scarlett*, 985 P.2d 36, 39 (Colo. App. 1998) ("Speculative assertions regarding the possible exculpatory effect had the evidence been available for testing are not sufficient to meet this burden."). In the absence of a showing of how evidence about the angle of the bullet at the time it penetrated the shirt would have assisted her self-defense theory, we cannot conclude that the trial court erred by finding Williams failed to meet her burden under the second *Trombetta* prong.

3.     Availability of Comparable Evidence by Reasonable Means

¶ 29     Williams's claim also fails to satisfy the third *Trombetta* prong — that she could not obtain comparable evidence by another

reasonable means.  As the People note, one of the prosecution's witnesses — the medical examiner who conducted the autopsy — explained that Williams shot Tomlinson at "near-contact range," which corroborated Williams's testimony that Tomlinson was very close to her when she pulled the trigger.  The medical examiner also testified that the photograph of Tomlinson's shirt had gunshot residue around the bullet hole, which indicated the barrel of the gun could not have been "more than a few inches" away from his shirt.

¶ 30    Williams fails to explain how the absence of the test results from the bullet wipe could not be mitigated by the other available evidence that supported her narrative.  Indeed, in her motion to suppress, her counsel acknowledged that the medical examiner reported that Tomlinson's gunshot wound "was sustained at 'near-contact range' and that there was black soot surrounding the gunshot hole on the shirt."[2]  And Williams's counsel said that "[b]oth of these facts would have been important for arguing self-defense . . . as the discharge of a single shot at close range could

---

[2] The photograph of the shirt showed the black soot around the bullet hole.

help substantiate Ms. Williams's claim that she shot . . . Tomlinson as he was charging at her in order to seriously injure or kill her." In addition, in an affidavit submitted in support of the motion to dismiss, Tewes stated that the medical examiner concluded that "the shooting was from 'near contact' range" and "that usually means within inches. This distance is an extremely important component of any self-defense claim."

¶ 31    Similar evidence was admitted at trial. In addition, Williams herself testified that Tomlinson was three to four feet from her when she fired. And even the prosecution's CBI expert testified that Tomlinson was within four to seven feet of her. Thus, the evidence indicated that Tomlinson was either a few inches or a few feet from Williams when she fired. Given this record, we discern no error in the trial court's denial of the motion to dismiss.[3]

---

[3] Our analysis of the third *Trombetta* prong would be the same even if we concluded that the consumed or destroyed bullet wipe evidence was not apparently exculpatory, but rather only potentially useful, and that Williams had demonstrated that the prosecution acted in bad faith. *See People v. Wyman*, 788 P.2d 1278, 1279 (Colo. 1990). Thus, we need not address the "bad faith" exception further.

III.    Specific Evidence of Tomlinson's Abuse of a Former Girlfriend

¶ 32    Williams contends that the trial court violated her constitutional right to present a full defense by precluding her from calling Tomlinson's ex-girlfriend, Sara Gentile, to testify about Tomlinson's prior acts of violence against her until after Williams testified that she was aware of such acts.  We perceive no abuse of discretion in the trial court's ruling.

A.    Additional Facts

¶ 33    The defense listed Gentile as a pretrial witness.  The prosecution objected to Gentile's proffered testimony, which was about specific instances of Tomlinson's violent acts toward her during their relationship.  The prosecution argued that if Williams lacked knowledge about those acts, they were irrelevant to her self-defense claim.  The trial court agreed that the evidence of Tomlinson's specific abusive acts would become relevant only if Williams testified that she was aware of such acts.  Thus, the court ruled that Gentile could not testify until after Williams testified that she was aware of them before she shot Tomlinson.

¶ 34    Defense counsel renewed their request to call Gentile on the basis that Tomlinson's specific acts toward Gentile could be

admitted to prove Tomlinson's alleged character trait for violence. The court denied defense counsel's motion after finding that character evidence must be confined to either reputation or opinion evidence.

B. Standard of Review and Applicable Law

¶ 35    We review a trial court's evidentiary ruling for an abuse of discretion. *People v. Elmarr*, 2015 CO 53, ¶ 20.  A trial court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair, or is based on an erroneous view of the law. *Id.*

¶ 36    If a trial court's evidentiary ruling effectively deprives a defendant of the opportunity to present a defense or conduct meaningful cross-examination on material issues, it may violate a defendant's due process rights, in which case we review for constitutional error. *People v. Beilke*, 232 P.3d 146, 149 (Colo. App. 2009).  Deprivation of the right to present a complete defense occurs only if the ruling "effectively barred the defendant from meaningfully testing evidence central to establishing [her] guilt." *Krutsinger v. People*, 219 P.3d 1054, 1062 (Colo. 2009).  But Williams did not preserve her constitutional contention.  Thus, we

review this claim for plain error. Plain error is error that is "obvious and substantial," and we reverse only if the error casts serious doubt on the reliability of the conviction. *Hagos v. People*, 2012 CO 63, ¶ 14.

¶ 37    Evidence that a person acted in conformity with a character trait is prohibited under the Colorado Rules of Evidence, unless it falls within an enumerated exception. *See* CRE 404(a). One of those exceptions is evidence offered to prove "a pertinent trait of character of the alleged victim of the crime offered by an accused." CRE 404(a)(2); *People v. Rogers*, 690 P.2d 886, 888 (Colo. App. 1984).

¶ 38    Defendants are usually permitted to introduce only reputation or opinion testimony about the victim's character, not evidence of specific prior acts. CRE 405(a). However, if a defendant knows of the victim's prior violent acts at the time of the offense, evidence of the specific acts may be admitted to prove the reasonableness of a defendant's belief that they were in imminent danger of being victimized by unlawful physical force. *People v. Jones*, 675 P.2d 9, 17 (Colo. 1984). To present such specific evidence, the defendant must show that

17

> (1) [she] contends that [she] acted in self-
> defense and there is competent evidence to
> support the contention, (2) either the act
> occurred or [the] defendant became aware of
> its occurrence within a reasonable time of the
> homicide, and (3) the defendant knew of the
> victim's prior violence at the time of the
> homicide.

*People v. Ferrell*, 613 P.2d 324, 326 (Colo. 1980).

¶ 39    CRE 104(b) provides that when "the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition."

## C.    Analysis

¶ 40    Contrary to Williams's arguments on appeal, the trial court did not bar the admission of Gentile's testimony. Rather, the court ruled that her testimony would not be admitted until after Williams — the only witness who could verify that she knew of Tomlinson's prior acts of violence against Gentile — had actually testified that she was aware of the specific instances of domestic violence that Gentile planned to describe. Thus, the court did not exclude the evidence; rather, it controlled its timing by delaying it until after Williams's testimony.

¶ 41    After the prosecution presented its case-in-chief, Williams's counsel called Gentile as a witness. The prosecution objected to her testifying about specific acts of violence committed against her by Tomlinson. Defense counsel responded by arguing that Williams was aware of these prior acts based on statements Tomlinson had made to her. Counsel argued that such evidence was relevant to address the credibility of Williams's anticipated testimony that she was aware of these incidents and that her awareness contributed to her reasonable fear that Tomlinson was about to use unlawful physical force against her when she shot him. Counsel also argued that evidence of these prior abusive incidents was admissible to establish Tomlinson's character trait for domestic violence.

¶ 42    The prosecutor conceded that Gentile could testify about specific acts of past violence, provided that Williams first testified that she was aware of those acts before she shot Tomlinson. In response, Williams's counsel assured the court that Williams would testify that she was aware of those prior acts. The trial court responded by noting that the decision whether Williams would testify did not rest with defense counsel, and instead was Williams's personal decision. *See People v. Curtis*, 681 P.2d 504, 512 (Colo.

1981) ("[T]he decision on whether to take the stand is ultimately to be made by the defendant."). Thus, the court expressed concern that counsel's assurance alone was insufficient for admission of Gentile's testimony.

¶ 43 Defense counsel then offered to call Williams to briefly testify to the court — outside the presence of the jury — that she was aware of Tomlinson's prior acts of violence against Gentile. The trial court denied this request. The court inquired about whether there were scheduling problems with obtaining Gentile's testimony. Williams's counsel responded that Gentile had travelled from Grand Junction, and it was likely that if Williams was required to testify first, Gentile's testimony would not be presented until the following day.

¶ 44 At oral argument, Williams's counsel acknowledged that Gentile was under subpoena to testify. And the record does not disclose what difficulties, if any, Gentile would experience by delaying her testimony.

¶ 45 Ultimately, Williams elected to testify. She stated that she was aware of one specific act of violence against Gentile because Tomlinson had told her about it. Contrary to the proffer offered by

Williams's counsel, Williams did not testify that she was aware of multiple incidents of prior violence against Gentile.  But Williams also testified that she knew Tomlinson had assaulted a man who had testified against him, and Tomlinson's stepbrother.

¶ 46     Williams contends that the trial court erroneously concluded that the admission of her testimony was a condition precedent to the admission of Gentile's testimony.  To the extent that the court's ruling lends itself to this interpretation, we agree that it was erroneous.  The supreme court has expressly rejected the proposition that "there must be competent evidence to satisfy the *Ferrell* test as a condition precedent to the presentation of the prior violence evidence."  *People v. Lyle*, 613 P.2d 896, 898 (Colo. 1980).  In rejecting the "condition precedent" argument, the court noted that CRE 104(b) was expressly designed to permit the parties and the court flexibility and efficiency in presenting evidence in a manner that is not unduly confusing or prejudicial.  *Id.*

¶ 47     Williams seems to argue that *Lyle* establishes a per se rule that a court must permit a third party to testify concerning specific acts of violence based on a representation from counsel that the defendant will eventually take the stand and confirm that she was

aware of such prior acts. But we do not read *Lyle* so broadly. As the supreme court there stated, "[T]o comply with the requirements of [CRE] 104(b), the defendant must, at a *minimum*, make an offer of proof that there will be 'the introduction of evidence sufficient to support a finding of the fulfillment of the condition.'" *Id.* (emphasis added). But it does not necessarily follow from this statement that the court *must* permit the third party to testify based on counsel's representation that the defendant will testify that they were aware of the prior incident.

¶ 48 Because a defendant alone controls whether they will testify, no matter the confidence of counsel's good faith representation, whether a defendant will testify remains uncertain until they actually take the stand. And clearly, the court was concerned about this possibility. When counsel represented that "the defendant is absolutely testifying and . . . will be saying that this is one of the things she was aware of and was under consideration at the moment that we're talking about," the court responded, "[B]ut that's not your choice. That's [Williams's] choice." *See Curtis*, 681 P.2d at 512.

¶ 49    If, despite counsel's assurances, Williams exercised her right to remain silent, the admission of Gentile's testimony concerning Tomlinson's specific acts of violence could have resulted in a mistrial. *See Lyle*, 613 P.2d at 898 ("If there was no evidence to satisfy the *Ferrell* test, it would have been proper for the trial court to declare a mistrial or impose any other appropriate sanction."). Moreover, as illustrated by Williams's testimony in this case, sometimes counsel misapprehends the scope of the testimony a defendant may be able to provide. Williams only testified that she was aware of one of the prior violent acts against Gentile, not the multiple acts that counsel had forecasted eliciting from Gentile.

¶ 50    Moreover, the record provides no explanation of whether Williams's counsel tried to present Gentile's testimony — in person or remotely — after Williams had testified. Nor does the record reflect any request to preserve Gentile's testimony via video so it could be presented to the jury after Williams testified.

¶ 51    For these reasons, we reject Williams's contention that the trial court necessarily erred by requiring Williams to testify to her knowledge about the specific acts before Gentile testified.

23

¶ 52    But even if we were to assume the trial court erred, we would conclude that the error was harmless.  First, we reject Williams's argument that the court's ruling deprived her of the ability to present a complete defense.  To deprive a defendant of their right to present a complete defense, the court's ruling must effectively deny a defendant the opportunity to meaningfully test evidence central to establishing her guilt.  *Krutsinger*, 219 P.3d at 1062.  That did not occur here.

¶ 53    In addition, Williams testified about one of the specific acts that Gentile would have addressed.  Furthermore, she described the other violent acts that Tomlinson perpetrated against his stepbrother and a witness who had testified against him in an unrelated matter.  And the evidence was undisputed that Tomlinson injured Williams during the extended physical altercation that preceded his death.  Given these facts, there is little doubt that the jury was aware of Tomlinson's propensity for physical violence and that Williams was aware of that propensity.

¶ 54    True, as Williams argues, Gentile's testimony would have provided independent corroboration of Williams's testimony about the prior acts of violence.  But given the substantial evidence of

Tomlinson's violence against Williams and others, we cannot conclude that the court's ruling regarding Gentile's testimony substantially influenced the verdict or the fairness of the trial. *See Hagos*, ¶ 12. And because we conclude that any error does not require reversal under the harmless error standard, it necessarily follows that reversal is not required under the plain error standard applicable to her constitutional argument. *Id.* at ¶ 14 (A plain error "must impair the reliability of the judgment of conviction to a greater degree than under harmless error to warrant reversal.").

## IV. Initial Aggressor Instruction

¶ 55 Williams next contends that the trial court violated her right to due process by instructing the jury on the initial aggressor exception to self-defense. We discern no error.

### A. Standard of Review and Applicable Law

¶ 56 A trial court has a duty to properly instruct the jury on the applicable law. *People v. Claycomb*, 2025 COA 36, ¶ 14. We review de novo whether the trial court's instructions, read as a whole, correctly informed the jury on the controlling law. *Tibbels v. People*, 2022 CO 1, ¶ 22. Generally, we review "a trial court's decision to give, or not to give, a particular jury instruction for an abuse of

discretion." *People v. Payne*, 2019 COA 167, ¶ 16. But we review de novo whether there was sufficient evidence to warrant an initial aggressor instruction. *Castillo v. People*, 2018 CO 62, ¶ 32.

¶ 57 A person is justified in using physical force upon another person "in order to defend [herself] . . . from what [she] reasonably believes to be the use or imminent use of unlawful physical force by that other person." § 18-1-704(1), C.R.S. 2025. For the use of deadly physical force to be justified, the defending person must reasonably believe that a lesser degree of force is inadequate and that "[she] or another person is in imminent danger of being killed or of receiving great bodily injury." § 18-1-704(2)(a).

¶ 58 When properly raised, the prosecution must disprove beyond a reasonable doubt the existence of self-defense. *Castillo*, ¶ 39. One way for the prosecution to meet that burden is to prove that an exception to self-defense applies. *Id.* at ¶ 40.

¶ 59 Initial aggressor is one such exception. A defendant may be the initial aggressor if they "initiated the physical conflict by using or threatening the imminent use of unlawful physical force." *Id.* at ¶ 41 (citation omitted). A court may give an initial aggressor instruction "if the evidence will support a reasonable inference that

26

the defendant initiated the physical conflict by using or threatening the imminent use of unlawful physical force." *People v. Griffin*, 224 P.3d 292, 300 (Colo. App. 2009).

¶ 60    In light of these authorities, the court gave a self-defense instruction stating, as relevant here, that Williams was entitled to use deadly physical force against Tomlinson provided

> she was not the initial aggressor, or, if she was the initial aggressor, she had withdrawn from the encounter and effectively communicated to the other person her intent to do so, and the other person nevertheless continued or threatened the use of unlawful physical force.

## B.    Analysis

¶ 61    Williams contends that giving this instruction was reversible error because, in her view, there was insufficient evidence to support a conclusion that she was the initial aggressor in the interaction that resulted in Tomlinson's death. The People respond that the trial court properly instructed the jury because there was some evidence showing that Williams was the initial aggressor.

¶ 62    As Williams contends, there was evidence produced at trial to support a conclusion that Tomlinson was the initial aggressor at all times, including when he was shot. But we disagree with Williams's

27

argument that there was insufficient evidence for a reasonable juror to infer that Williams was acting as the initial aggressor at the time of the shooting.

¶ 63 Even if we assume, for the sake of argument, that Tomlinson was the initial aggressor at some point during the parties' protracted interactions that night, an initial aggressor may lose that status by withdrawing from the confrontation and effectively communicating that intention to withdraw to the other party. *See Castillo*, ¶ 43 ("After an initial aggressor effectively withdraws from an encounter, the original non-aggressor becomes the aggressor when the original non-aggressor 'continues or threatens the use of unlawful physical force.'" (quoting § 18-1-704(3)(b))).

¶ 64 Williams concedes that, during the early stages of the altercation, she could have been viewed as the initial aggressor based on her conduct in the gas station parking lot. But she argues that she was no longer the initial aggressor at the time of the shooting because she disengaged from that initial confrontation by driving away. She argues that thereafter Tomlinson was the initial aggressor because he pursued her on his motorcycle, and he was

continuously the initial aggressor through the time that Williams shot him. That is a possible interpretation of the evidence.

¶ 65 But the question before us is narrower: whether a reasonable juror could conclude from the evidence that Williams was actually acting as the initial aggressor at the time she shot Tomlinson. Like the trial court, we answer that question affirmatively.

¶ 66 When a trial court instructs the jury on self-defense, it should instruct the jury on any exception to self-defense "if the exception is supported by some evidence." *Galvan v. People*, 2020 CO 82, ¶ 25. The supreme court has declared that "some evidence" is comparable to "'any credible [even if highly improbable] evidence,' 'a scintilla of evidence,' 'any evidence,' [and] a 'small quantum of evidence.'" *Id.* at ¶ 24 n.7.

¶ 67 Tomlinson crashed his motorcycle when Williams abruptly braked in front of him. After Williams stopped and spoke briefly with him, he told her to "just fucking leave," and she did. This arguably constituted a mutual disengagement from the events that had occurred before that time. But shortly after leaving the crash, Willliams returned. And she was armed with a loaded handgun in

29

her center console when she did so. Within seconds of returning, Williams used that gun to shoot Tomlinson.

¶ 68 Even if a jury concluded that Williams reasonably believed that Tomlinson was about to injure or kill her and that a lesser degree of force was inadequate, that same jury could conclude that by returning to the crash scene armed with a gun that she eventually fired at Tomlinson, Williams was acting as the initial aggressor in the renewed confrontation. *See People v. Roberts-Bicking*, 2021 COA 12, ¶ 36 ("[M]erely *producing* the pistol during an argument was sufficient to warrant instructing the jury on initial aggressor principles."); *Griffin*, 224 P.3d at 300 ("[E]ntering the house, returning with a gun, and shooting the [victim] in the back[] indicate [the defendant] had acted with intent, not in self-defense."); *People v. Newell*, 2017 COA 27, ¶ 28 (If "the prosecution has offered evidence that the defendant was the initial aggressor, the jury should be provided with the . . . initial aggressor exception, and be permitted to weigh the evidence to decide whether self-defense has been disproved.").

¶ 69 Thus, the court did not err by giving the initial aggressor instruction.

### V. Evidence of Flight

¶ 70 Williams also contends that the trial court erroneously instructed the jury that it could consider her post-shooting departure in determining her guilt or innocence. Again, we discern no error.

#### A. Standard of Review and Applicable Law

¶ 71 We review a trial court's decision to give a particular jury instruction for an abuse of discretion. *Payne*, ¶ 16. Williams's counsel did not object to the flight instruction at trial, so we review for plain error. *Hagos*, ¶ 14.

¶ 72 In Colorado, evidence of a defendant's flight may be admissible to show consciousness of guilt if certain conditions are met. *See People v. Summitt*, 132 P.3d 320, 324 (Colo. 2006). Flight refers to a deliberate attempt to avoid detection and arrest. *Id.* The supreme court has cautioned that when the defendant's identity is undisputed, giving a flight instruction is "rarely advisable and should never be given unless the peculiar facts of the case appear to make it essential." *Robinson v. People*, 165 P.2d 763, 765 (Colo. 1946). However, the supreme court has also stated that providing a flight instruction is not reversible error if the "defendant had reason

31

to believe that [she] had committed a crime, that [her] identity was known, that [her] pursuit and apprehension would probably ensue, and that [she] fled or concealed [herself] for any length of time to frustrate this apprehension." *People v. Larson*, 572 P.2d 815, 817 (Colo. 1977) (quoting *Robinson*, 165 P.2d at 765).

¶ 73 A number of jurisdictions do not merely caution against instructing the jury on a defendant's flight, but limit or expressly forbid the instruction. *See Hadden v. State*, 42 P.3d 495, 508 (Wyo. 2002) ("[W]e hold that hereafter . . . the giving of a flight instruction to the jury, in a criminal case, shall be reversible error."); *Dill v. State*, 741 N.E.2d 1230, 1233 (Ind. 2001) ("Because this flight instruction is confusing, unduly emphasizes specific evidence, and is misleading, we hold . . . that it was error to give the instruction."); *Renner v. State*, 397 S.E.2d 683, 686 (Ga. 1990) ("Hereafter, while the state may offer evidence of and argue flight, it shall be error for a trial court in a criminal case to charge the jury on flight." (footnote omitted)); *see also Ford v. State*, 206 So. 3d 486, 493 (Miss. 2016) (a flight instruction should only be given when (1) the flight is unexplained and (2) the circumstance has considerable probative value).

## B.    Analysis

¶ 74    At trial, the court instructed the jury as follows:

> If you find from the evidence beyond a reasonable doubt that the crime charged in the information was committed by some person, and that immediately after such crime was committed the defendant fled, such flight would be a circumstance, not sufficient in itself to establish the guilt of the defendant, but a circumstance which you may consider, in connection with all the other facts and circumstances proven at the trial, in determining the question of the guilt or innocence of the defendant.  It is for you to determine from the evidence whether such flight was caused by a consciousness of guilt or by some other and innocent motive.

¶ 75    Williams contends that instructing the jury to consider evidence of her flight was plain error because the supreme court has cautioned courts to only give a flight instruction when it is "essential" to a case.  *See Robinson*, 165 P.2d at 765.  She also argues that the instruction impermissibly shifted the burden of proof by unduly highlighting one piece of evidence and improperly suggested that Williams had the burden to prove her innocence.

¶ 76    The People reason that the trial court did not abuse its discretion or plainly err by giving the instruction because all four *Robinson* factors were present, and the court merely instructed the

33

jury that the flight evidence was "a circumstance" that the jury "*may* consider, in connection with all the other facts." (Emphasis added.)

¶ 77     We discern no error — much less plain error — in the trial court's instruction. Neither party points to any case law in Colorado holding or suggesting that it is reversible error to give a flight instruction when a defendant's identity is undisputed. Indeed, to the contrary, the supreme court has approved giving such an instruction when the *Robinson* factors are satisfied. *See id.*

¶ 78     There was sufficient evidence for a jury to find that Williams had reason to know that shooting Tomlinson was a crime. Second, her efforts to conceal her cell phone to avoid being tracked suggest that she was aware people may be able to identify her as the person who shot Tomlinson. Third, there was sufficient evidence to suggest that Williams knew that law enforcement would likely pursue her. Finally, Williams fled to Fort Morgan. Because there is sufficient evidence to support the instruction, and the supreme court has authorized giving it in these circumstances, we discern no error.

¶ 79     Nor are we persuaded by Williams's argument that the instruction improperly shifted the burden of proof by unduly focusing on evidence of her flight. The instruction properly informed the jury that it *may*, but was not required to, consider the circumstances of Williams's flight along with "the other facts and circumstances proven at the trial." Finally, we see no merit in Williams's argument that the instruction required her to prove her innocence simply because it permitted the jury to consider the flight evidence in determining "her guilt or innocence."

¶ 80     In the absence of further direction from the supreme court, it is not error to give a flight instruction when the *Robinson* factors are satisfied. Thus, the trial court did not error — plainly or otherwise — by giving the flight instruction.

## VI.   The Detective's Testimony

¶ 81     Williams next argues that the trial court abused its discretion by precluding defense counsel from eliciting testimony from a detective about the "21-foot rule." We disagree.

### A.   Standard of Review and Applicable Law

¶ 82     Recall that we review evidentiary rulings for an abuse of discretion. *Elmarr*, ¶ 20. For evidence to be admissible, it must be

relevant. CRE 402; *see People v. Rath*, 44 P.3d 1033, 1038 (Colo. 2002). Evidence is relevant if it has any tendency to make the existence of any consequential fact more or less probable than it would be without the evidence. CRE 401. But under CRE 403, otherwise relevant evidence may be excluded if its relevance is substantially outweighed by the potential for unfair prejudice.

### B. Analysis

¶ 83 During the trial, Williams's counsel attempted to elicit testimony from a detective about a police training standard known as the "21-foot rule." The prosecutor objected on relevancy grounds, and the court sustained the objection. Outside the hearing of the jury, Williams's attorney explained that "the reason it's relevant is the 21-foot rule talks about how police officers know that anyone who gets within 21 feet of you, even if you have a weapon, can get to you faster than you can raise the weapon." The prosecutor maintained his objection, arguing that police training standards were irrelevant to Williams's self-defense claim, and the court again sustained the objection on relevancy grounds.

¶ 84 Williams argues that the exclusion of this testimony violated her constitutional right to put forth a full defense because it would

36

have supported her self-defense theory. Specifically, Williams reasons that testimony about the 21-foot rule would have provided support for her use of lethal force against Tomlinson. The People respond that the trial court correctly determined that evidence about a police officer's use-of-force standard was irrelevant to the self-defense theory.

¶ 85 First, we reject Williams's argument that the court's ruling deprived her of her constitutional right to present a complete self-defense theory. Through both her testimony and the experts' testimony, Williams was permitted to present extensive evidence supporting her self-defense theory. *See Krutsinger*, 219 P.3d at 1062. Thus, we review this evidentiary ruling for an abuse of discretion. *Elmarr,* ¶ 20.

¶ 86 Williams was not a member of the law enforcement community, and there was no evidence that she was familiar with the rule. Moreover, a person in a violent domestic confrontation is not similarly situated to a law enforcement officer performing their professional duties. The substantial distinctions between those relationships could have blurred the jury's assessment of both the objective and subjective reasonableness of Williams's actions. *See*

*People v. Darbe*, 62 P.3d 1006, 1010 (Colo. App. 2002) ("Self-defense under [section] 18-1-704 takes into account both the reasonable belief and the actual belief of the defendant."). Thus, admission of such testimony may have misled and confused the jury. *See* CRE 403.

¶ 87 Accordingly, the trial court did not abuse its discretion by excluding evidence related to the "21-foot rule."

## VII. Cumulative Error

¶ 88 Finally, Williams contends that the cumulative effect of all the alleged errors warrants reversal. "The doctrine of cumulative error is based on the notion that multiple errors, in isolation, may be viewed as harmless, but the synergistic effect of the multiple errors may be so prejudicial that they deprive a defendant of a fair trial." *People v. Serna-Lopez*, 2023 COA 21, ¶ 47. "Stated simply, cumulative error involves cumulative prejudice." *Howard-Walker v. People*, 2019 CO 69, ¶ 25. We have identified one possible error as it relates to the trial court's analysis of the admissibility of Gentile's testimony. But we have not identified any other actual or potential error. Because we have not identified multiple errors, Williams's cumulative error claim fails. *See id.*

## VIII. Disposition

¶ 89 The judgment is affirmed.

JUDGE J. JONES and JUDGE GROVE concur.