23CA0476 Peo v Lobato 12-11-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA0476
El Paso County District Court No. 22CR3027
Honorable Jessica L. Curtis, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Anthony Lobato,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE J. JONES
Grove and Schutz, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced December 11, 2025

---

Philip J. Weiser, Attorney General, Brittany Limes Zehner, Senior Assistant
Attorney General and Assistant Solicitor General, Denver, Colorado, for
Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, M. Shelby Deeney, Deputy
State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1    Defendant, Anthony Lobato, appeals the district court's judgment of conviction entered on jury verdicts finding him guilty of two counts of second degree assault, one count of third degree assault, and two crime of violence sentence enhancers.  We affirm.

## I.    Background

¶ 2    One evening, Brandi Medina and her husband, Gerald Burt, hosted a cookout at their house.  They invited their neighbors, Terry and Brandy Blansett.  They also invited Lobato (Medina's half-brother) and his girlfriend, Cayla Brengard.  Following a long period of estrangement, Medina and Lobato had, in the year prior, resumed contact.

¶ 3    The party started well.  Medina, Lobato, and Brengard were in the garage; Burt and the neighbors were in the back yard.  Suddenly, Lobato got into his car alone and left the party.  No one knew where he went.

¶ 4    A short time later, Lobato returned to the party and walked into the garage from the front of the house.  He walked up to Brengard and, without provocation, headbutted her in the face.  He then went through the garage and into the backyard.  He walked over to Burt, who was bending down to grab a beer, and kicked him

1

in the face. Lobato then grabbed Terry Blansett, put him in a headlock, and headbutted him in the face. He picked up a chair and threw it at Brandy Blansett. Terry Blansett yelled at Lobato that he was "going home [to] get my gun." Lobato threw Terry Blansett to the ground and hit him several times. The fight then moved into the front yard, where it was recorded by a nearby Nest Cam and Ring camera.

¶ 5 Hoping to stop Lobato from hitting Terry Blansett, Medina hit Lobato with a chair. Lobato then grabbed Medina by her hair and began yanking her around.

¶ 6 Burt told Lobato to leave Medina alone. Lobato hit Burt again. Medina got on top of Burt and screamed for someone to call the police. Lobato then left the house.

¶ 7 Officers later arrived at the house, and an ambulance took those injured to the hospital. Medina, Terry Blansett, and Burt sustained multiple injuries. Brengard told officers that Lobato most likely drove back to their shared storage unit. After interviewing the party-goers at the hospital, the officers went to the storage unit to find Lobato.

¶ 8    When officers arrived at the storage facility, they saw Lobato's car parked in front of the unit he shared with his girlfriend.  An officer testified that, when officers tried to open the storage unit, it felt like someone inside was holding the door closed.  Officers repeatedly announced their presence (over a loudspeaker) and told the person in the unit to come out.  When no one answered or came out, the officers called in a SWAT team due to the violent nature of Lobato's altercations at the party and their suspicion that Lobato might be in the storage unit.  They also obtained an arrest warrant.  The SWAT team arrived, repeatedly announced its presence and the possibility of greater use of force, and told the person inside the unit to come out.  When nobody responded, the SWAT team sprayed pepper spray into the unit through a hose.  A recording from an officer's body camera showed that after the officers sprayed the pepper spray, Lobato came out of the unit and was arrested.

¶ 9    A jury convicted Lobato of all the assault charges relating to Medina, Burt, and Terry Blansett.  The district court sentenced him to fifteen years in the custody of the Department of Corrections.

## II.    Discussion

¶ 10    Lobato contends that the district court erred by (1) denying his counsel's *Batson* objection; (2) admitting into evidence a video of his arrest; (3) denying his counsel's request for a mistrial based on jurors possibly seeing him in handcuffs; (4) admitting officer testimony about obtaining search and arrest warrants; and (5) ordering restitution.  We reject each of his contentions.

### A.    *Batson* Challenge

¶ 11    Lobato contends that the district court clearly erred by denying his counsel's *Batson* objection to the prosecutor's use of a peremptory challenge to strike a particular potential juror because the court (1) incorrectly concluded that there needed to be a pattern of peremptory strikes of minority persons to support a *Batson* objection and (2) credited the prosecutor's race-neutral explanation for dismissing the juror.  We aren't persuaded.

#### 1.    Relevant Facts

¶ 12    During voir dire, the prosecutor asked the prospective jurors whether they could ever tell what another person is thinking.  Juror 15, who had a Hispanic surname, responded, "Not really."  The prosecutor asked Juror 15 if he could ever infer whether someone

4

acted purposefully or accidentally, and he responded, "Possibly by looking at their face, a particular action they take or a certain movement." When the prosecutor followed up on that response, asking whether someone could tell whether another person acted purposefully depending on what that person does, Juror 15 said, "Well, I'm not really sure."

¶ 13    After voir dire, the prosecutor used the prosecution's fifth peremptory challenge to excuse Juror 15. Lobato's counsel objected, asserting that the challenge was discriminatory under *Batson v. Kentucky*, 476 U.S. 79 (1986), because Juror 15 was Hispanic or Latino. The district court noted that there were "other . . . people of color with traditionally Hispanic surnames" within the jury pool. The prosecutor said he excused Juror 15 because his responses to questions about what someone was thinking suggested that he would hold the People to too high of a standard for proving the mens rea component of the charges. The court first determined that, based on its recollection, Juror 15 was indeed unable to satisfactorily answer the questions — and therefore found that the prosecutor's reason was "sufficient" — and then said there

were "several people of color" remaining in the pool.  So the court

denied the challenge.

### 2.  Applicable Law and Standard of Review

¶ 14    To ensure that individuals aren't excluded from jury service

because of their race, the United States Supreme Court has

established a three-step test to evaluate claims of racial

discrimination in jury selection.  *Batson*, 476 U.S. at 95-98.

¶ 15    First, the opponent of the strike must make a prima facie case

of racial discrimination by showing that the "totality of the relevant

facts gives rise to an inference of purposeful discrimination."

*Valdez v. People*, 966 P.2d 587, 589 (Colo. 1998) (citing *Batson*, 476

U.S. at 96-98).  A struck juror being a member of a minority group

"does not, in itself, raise an inference of discrimination."  *People v.*

*Rodriguez*, 2015 CO 55, ¶ 16 (quoting *United States v. Vasquez-*

*Lopez*, 22 F.3d 900, 902 (9th Cir. 1994)).

¶ 16    Second, if a defendant establishes a prime facie case, the

burden shifts to the proponent of the strike to provide a race-

neutral explanation.  *Valdez*, 966 P.2d at 590.  This burden isn't a

high one, and the proponent doesn't need to provide a persuasive or

even plausible explanation.  *Id.*

¶ 17    Third, after the party opposing the strike is allowed to attempt to rebut the proponent's race-neutral reason, the court must determine whether the opponent has proved purposeful discrimination.  *Id.*  In making this assessment, the court may consider a variety of factors, such as "the proponent's demeanor, how reasonable or improbable the proponent's explanations are, and whether the proffered rationale has some basis in accepted trial strategy."  *People v. Collins*, 187 P.3d 1178, 1182 (Colo. App. 2008) (citing *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003)).

¶ 18    We review first- and second-step *Batson* determinations de novo, but we review the court's finding at the third step for clear error.  *Valdez*, 966 P.2d at 590-91.  The "trial court's step-three finding as to the existence of discrimination is due 'great deference,' as it 'turn[s] on evaluation of credibility.'"  *People v. Wilson*, 2015 CO 54M, ¶ 13 (quoting *Batson*, 470 U.S. at 98 n.21).  Under the clear error test, "an appellate court will set aside a trial court's findings of fact only if they are unsupported by the record."  *People v. Romero*, 2024 CO 62, ¶ 47.

### 3.  Analysis

¶ 19    Lobato argues that the court's comment that there were other "people of color with traditionally Hispanic surnames" in the remaining jury pool shows that it improperly required that he show a pattern of discrimination to prevail on his *Batson* challenge.  But the court made this statement at step one.  The fact that Juror 15 may be Hispanic doesn't alone show that, under the totality of the circumstances, there was an inference of racial discrimination. *Rodriguez*, ¶ 16.  And that was all Lobato's counsel offered at step one.  So it's questionable whether the totality of circumstances created an inference of racial discrimination.

¶ 20    But even if Lobato satisfied the first step, the court didn't clearly err at the third step by determining that the strike wasn't attributable to purposeful discrimination.  The court implicitly found the prosecutor's explanation race-neutral — a finding Lobato doesn't contest — and noted that Juror 15 seemed "unable to be responsive to the proponent's inquiries."  That finding is supported by the record.  And Juror 15's responses did indeed cast doubt on his ability to assess mens rea under the facts of this case in a way consistent with the prosecution's theory.

8

¶ 21    Lobato asserts that his counsel rebutted the prosecutor's explanation by pointing out that Juror 15 responded that he might be able to infer what someone is thinking "by looking at their face." But Juror 15 later hedged on that response. We observe that the prosecutor also dismissed Juror 6, who made comments similar to those made by Juror 15. There is no suggestion of purposeful discrimination as to that prospective juror. Thus, we conclude the district court didn't clearly err by accepting the prosecutor's explanation and finding that Lobato's counsel failed to prove purposeful discrimination.

## B.    Video Evidence of Lobato's Arrest

¶ 22    Lobato contends that the video evidence of his arrest introduced at trial was irrelevant and prejudicial because, contrary to the prosecution's assertion, it wasn't evidence of flight; it portrayed him as a dangerous person; and it was cumulative of officer testimony about the circumstances of his arrest. We aren't persuaded.

### 1.    Relevant Facts

¶ 23    On the first day of trial, the prosecution sought to introduce an eight-minute video of Lobato's arrest taken from an officer's body

camera. Lobato's counsel objected to the video, arguing that it was irrelevant and prejudicial. The prosecutor responded that the video showed Lobato's consciousness of guilt and cited *People v. Summitt*, 132 P.3d 320 (Colo. 2006), as support. After reviewing *Summitt*, the court ruled that introducing the entire video could be unduly prejudicial to Lobato but that a truncated version of the video could be admissible to show consciousness of guilt.

¶ 24 On the second day of trial, over defense counsel's renewed objection, the court admitted the shortened version of the video, which was less than a minute long. Officers who participated in Lobato's arrest also testified about the arrest.

2. Standard of Review and Applicable Law

¶ 25 "Trial courts have broad discretion in determining the admissibility of evidence based on its relevance, its probative value, and its prejudicial impact." *People v. Elmarr*, 2015 CO 53, ¶ 20. A court abuses that discretion when "its ruling is 'manifestly arbitrary, unreasonable, or unfair,' or where it is based on an erroneous view of the law." *Id.* (quoting *People v. Stewart*, 55 P.3d 107, 122 (Colo. 2002)).

¶ 26    All relevant evidence is presumptively admissible except as

otherwise provided by constitution, rule, or statute.  CRE 402.

Evidence is relevant when it makes a fact of consequence more or

less likely than it would be without it.  CRE 401.  And "once

relevance is established, the inferences drawn from that evidence

are solely for the jury to draw, not an appellate court."  *People v.*

*Gonzales,* 2019 COA 30, ¶ 37, *aff'd,* 2020 CO 71.  It doesn't matter

that "other inferences may be equally probable."  *Summitt,* 132 P.3d

at 324.  Nonetheless, even relevant evidence should be excluded if

its probative value is substantially outweighed by the danger of

unfair prejudice.  CRE 403.  Evidence is considered unfairly

prejudicial if it suggests a decision based on an improper basis,

such as "sympathy, hatred, contempt, retribution, or horror."

*People v. Valdez,* 2017 COA 41, ¶ 37 (quoting *People v. Dist. Ct.,* 785

P.2d 141, 147 (Colo. 1990)).

¶ 27    "Evidence of flight and concealment to avoid arrest can be

admissible to show [a defendant's] consciousness of guilt, 'but only

if it can be shown the defendant was aware he or she was being

sought.'"  *Summitt,* 132 P.3d at 324 (quoting *People v. Perry,* 68

P.3d 472, 475 (Colo. App. 2002)).  Such evidence is admissible if the

11

"defendant had reason to believe that he had committed a crime, that his identity was known, that his pursuit and apprehension would probably ensue, and that he fled or concealed himself for any length of time to frustrate this apprehension." *People v. Larson*, 572 P.2d 815, 817 (Colo. 1977) (quoting *Robinson v. People*, 165 P.2d 763, 765 (Colo. 1946)); *see also Summitt*, 132 P.3d at 324 ("Flight means a deliberate attempt to avoid detection and arrest.").

### 3. Analysis

¶ 28 Lobato argues that the video evidence of his arrest was irrelevant because it didn't show that he was in flight or attempting to conceal himself to avoid arrest. But there was evidence that Lobato knew police might seek him out and attempted to conceal himself. After Lobato hit Burt in the front yard, Medina shouted for someone to call the police, and Lobato immediately fled to a storage unit. *Compare Summitt*, 132 P.3d at 325 (the defendant wasn't aware that he was being sought by police, so he wasn't avoiding arrest by leaving the hospital and going home), *with People v. Sanchez*, 253 P.3d 1260, 1264-65 (Colo. App. 2010) (evidence that the defendant stabbed someone, heard someone say 911 had been called, fled, and hid in a trailer supported flight instruction).

12

¶ 29    And when officers arrived at the storage unit, Lobato didn't answer their requests for him to come out but instead remained quiet. He also tried to prevent officers from opening the storage unit's door. After he came out of the unit, he acted in a way that could be construed as seeking to evade arrest.

¶ 30    Lobato asserts that the storage unit was his residence, so he had simply returned home and wasn't actively avoiding arrest, like the defendant in *Summitt*. But Lobato didn't introduce substantial evidence that this storage unit was his residence. And even if it was, the facts in this case are distinguishable from those in *Summitt* because one could infer that Lobato knew that the police were being contacted and that they would seek to apprehend him. And, knowing that, Lobato didn't voluntarily leave the unit, but instead remained quiet, attempting to create the impression that he wasn't inside, and physically prevented police from opening the door.

¶ 31    Lobato also argues that, even if the video was relevant, it was unfairly prejudicial. Specifically, he argues that the video unfairly "painted [him] as a dangerous person." But the video was less than a minute long and was highly probative of consciousness of guilt.

We aren't convinced that its probative value was substantially outweighed by any danger of unfair prejudice: the video didn't show Lobato armed or attacking anyone, and, perhaps other than when it showed him getting on his feet (disobeying officer commands), it didn't portray him as particularly aggressive.

¶ 32    The video also wasn't needlessly cumulative. Though officers testified at trial about the arrest, "[t]he fact that evidence is cumulative does not, by itself, render the evidence inadmissible." *People v. Thompson*, 2017 COA 56, ¶ 184 (quoting *People v. Pahlavan*, 83 P.3d 1138, 1140 (Colo. App. 2003)). The officers testified about their own perspectives of the arrest. The video allowed the jury to make its own conclusions. *See* CRE 403 (relevant evidence "may be" excluded if it is "*needless[ly]* . . . cumulative*" (emphasis added)).

### C.    Jurors' View of Lobato in Handcuffs

¶ 33    Lobato contends that there was a possibility that jurors saw him in handcuffs, which violated his right to due process and required a mistrial. Again, we disagree.

## 1. Relevant Facts

¶ 34    During a break at trial, two jurors saw Lobato in the courthouse hallway.  They saw him from the front as he was being escorted with his hands cuffed behind his back.  A deputy was walking in front of Lobato (and therefore between Lobato and the jurors).  The trial judge was in the hallway walking behind Lobato and saw the event.  After the break, the judge said for the record that the two jurors were about twenty-five yards away from Lobato and couldn't see his handcuffs.

¶ 35    Lobato's counsel moved for a mistrial due to concerns that the jurors had seen Lobato in handcuffs.  In the alternative, counsel requested that the court poll all the jurors about whether they had seen Lobato's handcuffs.  The court declined to poll the jurors, saying that doing so would disclose to all the jurors that Lobato was in handcuffs, and therefore would be "essentially telling [the jury] what they saw."  The court denied the request for a mistrial because there wasn't a "manifest necessity for it" given that the jurors "could not see his hands" and wouldn't consider it unusual that anyone in the back hallway needed to be escorted.

15

## 2. Applicable Law and Standard of Review

¶ 36 A defendant is entitled to appear innocent in front of the court, and "the presumption of innocence requires the garb of innocence." *People v. Dillon*, 655 P.2d 841, 846 (Colo. 1982) (quoting *Eaddy v. People*, 174 P.2d 717, 718 (Colo. 1946)). Exposing a shackled defendant to a jury can warrant a mistrial if shackling is deemed unnecessary and prejudicial. *Id.* Thus, shackling a defendant, including handcuffs, in front of a jury is prohibited unless the court determines that it's necessary. *Hoang v. People*, 2014 CO 27, ¶ 13.

¶ 37 If a defendant requests a mistrial, the court must determine whether "the 'prejudice to the accused is too substantial to be remedied by other means.'" *Bloom v. People*, 185 P.3d 797, 807 (Colo. 2008) (quoting *People v. Collins*, 730 P.2d 293, 303 (Colo. 1986)), *superseded by statute on other grounds*, Ch. 389, sec. 9, § 16-8-111, 2008 Colo. Sess. Laws 1856; *see also People v. Jackson*, 2018 COA 79, ¶ 20 ("Declaring a mistrial is 'the most drastic of remedies' . . . ." (quoting *People v. Santana*, 255 P.3d 1126, 1132 (Colo. 2011))), *aff'd*, 2020 CO 75.

¶ 38 Mere inadvertent exposure of a handcuffed defendant in a court hallway normally doesn't warrant a mistrial. *Dillon*, 655 P.2d

16

at 846 (discussing *Scott v. People*, 444 P.2d 388 (Colo. 1968), and *McLean v. People*, 473 P.2d 715 (Colo. 1970)); *see also Hamrick v. People*, 624 P.2d 1320, 1323 (Colo. 1981) ("[T]he momentary, inadvertent exposure of the defendant in handcuffs, outside the courtroom . . . did not prejudice the defendant's right to a fair trial.").

¶ 39    The district court is in the best position to determine whether a mistrial is warranted, and we won't overturn its ruling absent a showing of a gross abuse of discretion and prejudice to the defendant. *Bloom*, 185 P.3d at 807.

### 3.    Analysis

¶ 40    Lobato argues that even though the judge witnessed the event, she didn't have the same vantage point as the jurors and therefore couldn't "say for certain that the jurors did not see the handcuffs." And because the judge declined to poll the jurors, Lobato says, "there was no concrete evidence that the jury did *not* see Mr. Lobato" in handcuffs.

¶ 41    But the defendant has the burden to show that the jurors saw the handcuffs. *See Hoang*, ¶ 24. And the judge said the exposure was "very quick" and the jurors didn't see the handcuffs. We are in

17

no position to second-guess the district court's finding. *See People v. Beauvais*, 2017 CO 34, ¶ 31 ("As with any other finding of fact, a highly deferential standard of review precludes an appellate court from substituting its reading of a cold record for the trial court's in-the-moment and better-informed determination.").

¶ 42 We recognize that the district court didn't articulate the proper standard in determining whether a mistrial was appropriate. The court said that there wasn't a "manifest necessity" for a mistrial, when it should have said the question is whether any prejudice to Lobato was too substantial to be remedied by other means. *See Bloom*, 185 P.3d at 807-08. But, in effect, the court applied the correct standard: It considered whether Lobato was prejudiced by the encounter and concluded that he wasn't. *See id.* at 808 (where the district court articulated the wrong standard but applied the correct one, and came to the correct conclusion, there was no error).

D. Officer Testimony About Search and Arrest Warrants

¶ 43 Lobato contends that officer testimony about the issuance of search and arrest warrants violated his right to a fair trial because

the statements were prejudicial given that probable cause wasn't at issue. We conclude that there was no reversible error.

### 1. Relevant Facts

¶ 44 At trial, multiple officers testified about the circumstances surrounding Lobato's arrest. Lobato argues that two of the officers' statements[1] violated his right to a fair trial because the officers mentioned search and arrest warrants:

1. Officer Clinton testified that after she spoke with the victims at the hospital, she "went to [the] police station to write a warrant." Lobato's counsel didn't object to this statement.

2. Sergeant Scott testified that she left a copy of the search warrant in the storage unit. Lobato's counsel objected to this statement. The court overruled the objection.

---

[1] Lobato actually asserts that there were three warrant-related statements that violated his right to a fair trial. But the district court sustained Lobato's counsel's objection to the third statement and told jurors to disregard it, and we don't review a claim of error if the court sustained an objection to the purportedly improper testimony and the defense didn't request any further relief (that the court denied). *See People v. Jamison,* 2018 COA 121, ¶ 37.

## 2. Standard of Review and Applicable Law

¶ 45    We review a district court's evidentiary rulings for an abuse of discretion. *See Elmarr,* ¶ 20. A district court abuses its discretion when "its ruling is 'manifestly arbitrary, unreasonable, or unfair,' . . . [or] based on an erroneous view of the law." *Id.* (quoting *Stewart,* 55 P.3d at 122).

¶ 46    If the defense didn't object to the testimony, we review any claim of error for plain error. *People v. Penn,* 2016 CO 32, ¶ 28. Under plain error review, we reverse only if the error was obvious and "so undermined the fundamental fairness of the trial . . . as to cast serious doubt on the reliability of the judgment of conviction." *Id.* (quoting *Hagos v. People,* 2012 CO 63, ¶ 14). But if the defense objected to the testimony, we review the claim of error for harmless error. *Hagos,* ¶ 12. Under harmless error review, "we reverse if the error 'substantially influenced the verdict or affected the fairness of the trial proceedings.'" *Id.* (quoting *Tevlin v. People,* 715 P.2d 338, 342 (Colo. 1986)).

¶ 47    Generally, when probable cause isn't at issue in a case, it is improper for a witness to testify about obtaining a search or arrest warrant or having probable cause to do so. *People v. Salazar,* 2023

20

COA 102, ¶ 39. But if the testimony was minimal and didn't provide details about the process of obtaining a warrant, any error in allowing it is typically considered harmless. *See id.* at ¶ 42.

### 3.    Analysis

¶ 48    Officer Clinton's statement arguably wasn't proper. But even if it was improper, any error in allowing it wasn't plain. It was made in passing, Officer Clinton didn't provide any detail about the process of obtaining a warrant, and the prosecutor didn't subsequently rely on it. *See People v. Mapps*, 231 P.3d 5, 12 (Colo. App. 2009); *People v. Renfro*, 117 P.3d 43, 48 (Colo. App. 2004); *cf. People v. Mullins*, 104 P.3d 299, 301-02 (Colo. App. 2004) (finding plain error because, among other things, the investigating officer went into detail about having probable cause to obtain an arrest warrant and the evidence against the defendant wasn't overwhelming).

¶ 49    Sergeant Scott only made a passing reference to a search warrant. She didn't discuss the details of applying for the search warrant. And again, the prosecutor didn't later rely on it. Therefore, any error in allowing this statement was harmless. *See Salazar*, ¶¶ 42-43.

## E. Cumulative Error

¶ 50    We reject Lobato's cumulative error argument. Considering the two errors we have assumed for purposes of argument (allowing the officers' statements regarding the warrants), Lobato wasn't denied his right to a fair trial. *See Howard-Walker v. People*, 2019 CO 69, ¶ 24.

## F. Restitution

¶ 51    Lobato contends that the district court erred by ordering restitution more than ninety-one days after sentencing, denying his counsel's request for an in camera review of supporting documentation, and ordering a restitution amount that isn't supported by the record. We disagree with these contentions.

### 1. Relevant Facts

¶ 52    At Lobato's sentencing on January 30, 2023, the court ordered him to pay restitution, with the final amount to be determined within ninety-one days unless there was a finding of good cause to extend the deadline. On March 10, the prosecution asked the court to order Lobato to pay $5,366.90 to the Colorado Crime Victim Compensation Board (CVCB). Four days later, Lobato's counsel objected to restitution and requested a hearing.

¶ 53    Before the hearing, Lobato's counsel asked the court to conduct an in camera review of the CVCB's supporting documents. At a status conference on April 17, after hearing arguments from both sides, the court said it wanted to review the issue further, which it said provided good cause to extend the ninety-one-day deadline. The court then set another hearing for April 24.

¶ 54    On April 24, the court ruled that it wouldn't review the CVCB documents because it wasn't persuaded by Lobato's counsel's evidentiary hypothesis for undertaking such a review. But the court ordered the prosecution to provide the defense with "a list of the amount of money paid to each provider by the [CVCB]," unless doing so "would pose a threat to the safety or welfare of a victim." The court set a date for a restitution hearing and again expressly found good cause to extend the deadline so that Lobato could be present at the hearing (a critical stage of the proceeding).

¶ 55    At the June 20 hearing, a CVCB administrator testified that the CVCB paid $5,205.05 to the victims. The court found that

Lobato's conduct proximately caused the amount requested by the CVCB and ordered restitution in the amount of $5,207.90.[2]

### 2. Timeliness of Restitution Order

¶ 56 Lobato contends that the district court improperly ordered restitution more than ninety-one days after sentencing. We disagree.

### a. Applicable Law

¶ 57 Defendants must "make full restitution to those harmed by their misconduct." § 18-1.3-601(1)(b), C.R.S. 2025. Thus, every order of conviction must include consideration of restitution. *See* § 18-1.3-603(1)(a), C.R.S. 2025. But, if a court orders restitution but defers ruling on the amount, it must determine the specific amount within ninety-one days after sentencing, or beyond that if the court finds good cause to extend the deadline. § 18-1.3-603(1)(b), C.R.S. 2022;[3] *see People v. Weeks*, 2021 CO 75, ¶¶ 4, 39.

---

[2] The final amount ordered reflects the amount requested by the prosecution on March 10, less a $159 payment to a Colorado Springs Radiologist.

[3] In 2025, the time period for determining restitution was changed from ninety-one to sixty-three days after sentencing. Ch. 307, sec. 1, § 18-1.3-603, 2025 Colo. Sess. Laws 1606. Because Lobato's sentencing occurred in 2023, we refer to the August 2022 version of the statute when referring to the deadline.

24

### b.    Analysis

¶ 58    In *Weeks*, the prosecutor asked at sentencing that the issue of restitution remain open because he hadn't yet filed a motion. *Weeks*, ¶ 11.  The supreme court held that the issue of restitution can't "remain open" after the judgment of conviction is entered.  *Id.* at ¶ 8.  Lobato argues that, as in *Weeks*, the district court left open the entire issue of restitution, and therefore the court's ultimate order awarding restitution was untimely.  But at the end of the sentencing hearing, the court said, "Restitution will be ordered, and the amount to be finalized in 91 days unless a good cause finding extends that."  That order complied with section 18-1.3-603(1)(b), C.R.S. 2022.  The court subsequently found good cause to extend the deadline — twice — and Lobato doesn't challenge those findings.  *See Weeks*, ¶ 5.

### 3.    In Camera Review of CVCB Records

¶ 59    Lobato also contends that the district court improperly refused to review the CVCB's records in camera even though his attorney provided a nonspeculative evidentiary hypothesis justifying such a review.  We disagree.

### a. Applicable Law and Standard of Review

¶ 60 In a restitution proceeding, "[t]he prosecution bears the burden of proving, by a preponderance of the evidence, . . . that the defendant's conduct was the proximate cause of the victim's loss." *People v. Henry*, 2018 COA 48M, ¶ 15. But if the restitution amount is requested on behalf of the CVCB, there is a rebuttable presumption that the amount is directly related to the defendant's conduct. *People v. Fregosi*, 2024 COA 6, ¶ 44 (citing § 18-1.3-603(10)(a)). A defendant may rebut this presumption by presenting evidence that the amount requested wasn't the result of his criminal conduct. *Id.*

¶ 61 The CVCB's records are confidential, so a defendant cannot, as a matter of right, obtain access to them. *Id.* at ¶ 52. But he may ask the court to conduct an in camera review of the CVCB's records if the request isn't speculative and is based on "an evidentiary hypothesis" that would rebut the statutory presumption. *Id.* at ¶ 54. The evidentiary hypothesis must show "'a specific factual basis demonstrating a reasonable likelihood' that the discovery will yield material evidence" regarding proximate cause. *Id.* at ¶ 56 (quoting *People v. Spykstra*, 234 P.3d 662, 671-72 (Colo. 2010)).

26

¶ 62    We review a district court's refusal to conduct an in camera review for an abuse of discretion.  *Id.* at ¶ 51.

### b.    Analysis

¶ 63    Before the April 17 status hearing, Lobato's counsel asked the court to conduct an in camera review of the CVCB records because counsel said she couldn't tell whether the services rendered were proximately caused by Lobato's conduct.  But such inability isn't a specific factual basis for review because it doesn't show that there is any likelihood that discovery will yield material evidence.  *See id.* at ¶ 56 (an expression of a desire for additional information is insufficient).  Thus, the district court didn't abuse its discretion by refusing to undertake an in camera review.

### 4.    Restitution Amount

¶ 64    Lobato contends that the district court improperly ordered a restitution amount that is $2.85 more than what the CVCB administrator testified to at trial.  We disagree.

### a.    Applicable Law and Standard of Review

¶ 65    The prosecution must prove the restitution amount by a preponderance of the evidence and may rely on documentary or nondocumentary evidence to meet this burden.  *See People v.*

*Babcock*, 2023 COA 49, ¶ 30, *aff'd*, 2025 CO 26; § 18-1.3-603(2). When the sufficiency of this evidence is at issue, we review de novo. *See People v. Stone*, 2020 COA 24, ¶ 7.

### b.     Analysis

¶ 66     Lobato argues that because the CVCB administrator testified to a restitution amount that was $2.85 less than what was ordered by the court, there isn't any evidence to support the court-ordered amount.  But the prosecution provided nontestimonial evidence supporting the amount ordered by the district court — the CVCB's written request.  Thus, there was evidence supporting the court's order, even if the CVCB administrator indicated a slightly different amount at the hearing.

### III.    Disposition

¶ 67     We affirm the judgment of conviction.

JUDGE GROVE and JUDGE SCHUTZ concur.